TOWN OF DEDHAM & another vs. LABOR RELATIONS
COMMISSION & others.

Norfolk.    February 6, 1974. — June 10, 1974.

Present: TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Municipal Corporations,* Employees, Collective bargaining.   *Labor.*
    *Public Employment.   Civil Service.*

Discussion of the relation of G. L. c. 31, § 43, to c. 149, §§ 178G-178N,
    with respect to a municipal civil service employee. [400-406]
Where a municipal civil service firefighter suspended for in-
    subordination sought relief under G. L. c. 31, § 43, before the Civil
    Service Commission, which upheld the suspension, and subsequently
    filed with the Labor Relations Commission under c. 149, § 178L, a
    complaint of a prohibited labor practice against the municipality and
    its fire chief, and the decision and orders of the Labor Relations
    Commission were in favor of the firefighter, it was error for the
    Superior Court in a suit for review under c. 30A, § 14, to rule on the
    basis of c. 149, § 178N, that the matter was exclusively within the
    jurisdiction of the Civil Service Commission, that the action taken by
    the Labor Relations Commission was therefore invalid, and that the
    proceeding before the Labor Relations Commission must be dis-
    missed. [393-406]

BILL IN EQUITY filed in the Superior Court on August 23,
1971.

The suit was heard by *McNaught,* J.

*Alexander Macmillan (Joellen D. Bogdasarian* with him)
for the Labor Relations Commission.

*Richard A. Gould,* Town Counsel, for the town of
Dedham.

*Michael A. Feinberg* for Warren W. Vaughan & others,
interveners, joined in a brief.

KAPLAN, J.   We face again the problem of meshing the
new labor rights guaranteed to public employees with

earlier provisions of law.[1] On the present appeal we have to deal with an accommodation between the statute empowering the Labor Relations Commission to rectify alleged interference by municipal employers with the protected mutual-aid activities of their employees, and the older statute establishing the Civil Service Commission as a guard against arbitrary disciplining of classified employees by their public employers. The field is dynamic. While the present proceedings were taking their course, the labor statute was altered and recodified as from July 1, 1974.[2] This will limit the practical effects for the future of a decision of this appeal.

1. *Facts.* On September 9, 1970, Warren W. Vaughan, a Dedham firefighter, one of the interveners-appellants herein,[3] engaged in a "heated conversation" with the deputy chief of the fire department, James Hall, at the Dedham fire station. On September 14 the chief of department, John L. O'Brien, one of the appellees, notified Vaughan that commencing that day he was suspended for five days with loss of pay for "insubordination" toward a superior officer arising out of the incident with Deputy Chief Hall.

On September 23 Vaughan requested a hearing before a member of the Civil Service Commission pursuant to G. L. c. 31, § 43 (e), as to whether the suspension was for "just

[1] See *Chief of Police of Dracut* v. *Dracut,* 357 Mass. 492, 499 (1970); *Kerrigan* v. *Boston,* 361 Mass. 24, 31 (1972); *Ellis* v. *Selectmen of Barnstable,* 361 Mass. 794 (1972); *Karchmar* v. *Worcester,* 364 Mass. 124, 129 (1973).

Problems of adjustment have been encountered also in other states. See *Wayne County Civil Serv. Commn.* v. *Board of Supervisors,* 384 Mich. 363, 369 (1971); *Erie County Water Authy.* v. *Kramer,* 4 App. Div. 2d (N. Y.) 545 (1957), affd. 5 N. Y. 2d 954 (1959). See generally Wellington and Winter, Structuring Collective Bargaining in Public Employment, 79 Yale L. J. 805, 862-864 (1970); Rubenstein, The Merit System and Collective Bargaining in Delaware, 20 Labor L. J. 161 (1969); Rehmus, Constraints on Local Governments in Public Employee Bargaining, 67 Mich. L. Rev. 919, 926-927 (1969); Edwards, The Emerging Duty to Bargain in the Public Sector, 71 Mich. L. Rev. 885, 910-912 (1973).

[2] See n. 14 below.

[3] The other interveners-appellants are officers of Local 1735, Dedham Firefighters Association, representing the membership.

cause." A week later, on September 30, Vaughan filed a complaint with the Labor Relations Commission charging a prohibited labor practice on the part of the appellees town of Dedham and its fire chief within the meaning of c. 149, § 178L (1), in that they had violated his protected rights under § 178H (1) to engage in activities on behalf of the firefighters for mutual aid free from interference, restraint, or coercion.[4]

A Civil Service Commissioner held a hearing on October 20 attended by Vaughan and counsel, and on January 13, 1971, the Civil Service Commission notified the fire chief that the suspension was justified but that the penalty should be reduced to a two-day suspension with loss of pay. The present record on appeal does not indicate what issues were considered, nor are any particular findings set out. Meanwhile the Labor Relations Commission, after investigation by its agents, issued its formal complaint on November 5, 1970, against the town and fire chief. At a hearing on January 5, 1971, before a Labor Relations Commissioner, the town and fire chief moved to dismiss the complaint on the ground that the commission lacked jurisdiction of the subject matter.[5] The motion was not allowed. Testimony was taken and recorded, and the following facts as to the September 9 incident appeared, embodied in the "Findings of Fact and Decision" of the commission, made part of its "Decision and Order" contained in the record on appeal.

Vaughan was a member of the executive board and past president of Local 1735, Dedham Firefighters Association. He was off duty on September 9, when he got into the "heated conversation" with Deputy Chief Hall in the presence of another firefighter. The subject was the duties to be performed by firefighters on holidays (such as Labor

---

[4] Section 178H (1) is quoted below at n. 12, and § 178L (1) at n. 13.

[5] They moved in the alternative to postpone the hearing until decision by the Civil Service Commission.

Day just passed). Vaughan objected to the men's being assigned window washing and similar chores and said this was in violation of the practice of "holiday routine" by which the men were to be excused certain maintenance jobs. Deputy Chief Hall refused to discuss this issue on the ground that "Vaughan was not running the Department." Vaughan told the deputy chief that he was going to bring the matter up at the next union meeting. He advised the men not to do work on holidays in the future beyond the "holiday routine." He then left the fire station.

On evidence going beyond the immediate incident, the Labor Relations Commission also found that Vaughan had an excellent record as a firefighter. In processing grievances and negotiating on labor matters over the previous two years, he had had many heated discussions with the fire chief. Examining the circumstances surrounding the fire chief's decision to suspend Vaughan, the commission found that the chief had ordered the suspension for other than disciplinary reasons. It may be added that the commission found there had in fact been a right to a "holiday routine" which had become vested by practice over a period of years despite "rules and regulations" promulgated by the fire chief.

On the whole case, the commission concluded that the formal complaint it had issued was supported by the testimony. Accordingly, it issued its order in two parts: first, that the appellees, town of Dedham and its fire chief, cease and desist from interfering with their employees in the exercise of their protected rights under the statute; second, that they take affirmative action[6] to "reinstate" Vaughan and make him whole by payment of the withheld salary, make available on request the records as to back pay, post a notice announcing their intention to comply with the directions to cease and desist and to reinstate, and notify the commission as to steps taken to comply with the order.

---

[6] Section 178L, fourth paragraph, speaks of "such further affirmative action as will comply with the provisions of this section."

The appellees filed a bill in equity in the Superior Court under the State Administrative Procedure Act, G. L. c. 30A, § 14, for review of the decision and order of the Labor Relations Commission. Although the pleader recited all plausible grounds of review listed in § 14 (8), the two distinctive grounds that appear pertinent were lack of jurisdiction of the Labor Relations Commission, and lack of substantial evidence to support the decision. The judge of the Superior Court held for the appellees on the first ground, ruling that the matter was beyond the jurisdiction of the Labor Relations Commission and "fell exclusively within the jurisdiction of the Civil Service Commission" under c. 31, § 43; thus the appellees' motion to dismiss should have been allowed, and the commission's prohibited practice complaint was now to be dismissed. The judge rested essentially on c. 149, § 178N, which states that "[n]othing in sections one hundred and seventy-eight F to one hundred and seventy-eight M, inclusive [the sections of c. 149 setting forth the rights and duties of municipal employees, and the relevant responsibilities of the Labor Relations Commission], shall diminish the authority and power of the civil service commission, or any retirement board or personnel board established by law, nor shall anything in said sections constitute a grant of the right to strike to employees of any municipal employer." The judge did not reach the question of substantial evidence. Appeal from the final decree was claimed by the Labor Relations Commission and the interveners, Vaughan and Local 1735.

2. *Statutes.* Until 1958, public employees in the Commonwealth, as in most States, had virtually none of the rights that had been widely guaranteed since the nineteen thirties to employees in private business to organize and bargain collectively and to be protected in the associated activities of asserting and negotiating grievances. Classified public employees were indeed entitled to the benefits of a civil service system designed, according to the "merit principle," to bring nonpartisanship and rationality into the processes of hiring, promotion, transfer, and discipline. These employees were protected against arbitrary punish-

ment, the usual issues being whether the charges made by the public authority as grounds for dismissals or suspensions — neglect of duty, incompetency, insubordination, venality, or the like — could be supported in fact. The question whether the charges were being used by the employers as excuses or masks for interference with the employees' rights to organize, present grievances, and so forth, had no particular place in proceedings before the Civil Service Commission because the rights themselves had not received recognition by law.

The civil service statute to this day does not in terms reflect labor rights of this character. Dismissal or suspension may be exacted only for "just cause," see G. L. c. 31, § 43, a formula that is not less than seventy years old.[7] The pattern of the procedure now is that the employee receives written notice from the "appointing authority" of the reason for its action, whereupon the employee may request a hearing by that authority;[8] if the decision is unfavorable, he may request a hearing before a member of the Civil Service Commission, who reports his findings to the commission, which acts to affirm, reverse, or modify. From an adverse determination, the employee may petition for review by a District Court (or the Municipal Court of the City of Boston), with the appointing authority and the commission named as respondents. § 45.[9]

Turning to the origin of the labor statute, the traditional hostility to organizational rights on the part of public employees gradually diminished in the post-war period, and in 1958 Massachusetts was among the first States to take steps — but they were quite ineffectual steps — to afford a measure of recognition to those rights. See St. 1958,

---

[7] Compare St. 1904, c. 314.

[8] The present record does not mention this step in the proceedings culminating in the action of the Civil Service Commission.

[9] For certain other possible modes of attack by the employee, see *Police Commr. of Boston* v. *Ciccolo,* 356 Mass. 555 (1969); cf. *Brouillette* v. *Worcester,* 364 Mass. 833 (1974). As to attack by the appointing authority upon a determination adverse to it, see *School Comm. of Salem* v. *Civil Serv. Commn.* 348 Mass. 696, 697-698 (1965).

c. 460, adding G. L. c. 149, § 178D. The Presidential Executive Order of 1962 (No. 10988, 5 U. S. C. A. § 7301 at 300 [1967], replaced by No. 11491 [1969], as amended, 3 C. F. R. 262 [1973]) granting rights of collective bargaining to Federal Employees added to the respectability and impetus of the movement, and by 1965 there had been much growth of unionization among public employees. 1971 Ann. Surv. of Mass. Law, §§ 6.1, 6.2. Legislation of 1964 and 1965 provided a fairly comprehensive code of collective bargaining law, both substantive and procedural, for the benefit of State and municipal employees, and it is this code which applied at the time of the events in suit and with which we are here concerned. St. 1964, c. 637, adding c. 149, § 178F. St. 1965, c. 763, adding c. 149, §§ 178G-178N.[10]

All municipal employees[11] are embraced in the 1965 code, "whether or not in the classified service of the municipal employer," except elected officials and certain others. § 178G. Passing over the rather elaborate provisions directed to the process of collective bargaining itself (§§ 178I-178K), § 178H (1) states the basic rights of employees to self-organization and to engage in the various ancillary concerted activities.[12] By § 178L, first paragraph, municipal employers are prohibited from interfering with those guaranteed rights (subdivision [1]), and from committing certain acts more particularly enumerated, such as "refusing to discuss grievances with the representatives of an employee organization recognized or designated as the exclusive representative in an appropriate unit" (subdivi-

---

[10] See Legislative Research Council Report Relating to Collective Bargaining and Local Government Employees in 1969 House Doc. 4746, pp. 8-9, 17-23.

[11] State employees are separately treated in c. 149, § 178F.

[12] Section 178H (1) reads in part: "(1) Employees shall have, and be protected in the exercise of, the right to self-organization, to form, join or assist any employee organization, to bargain collectively through representatives of their own choosing on questions of wages, hours and other conditions of employment and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, free from actual interference, restraint or coercion ...."

sion [5]).[13] Certain prohibitions are also laid on employee organizations (second paragraph). When complaint is made to the Labor Relations Commission that a prohibited practice has been committed, the commission may dismiss, or order a hearing, or an investigation to be followed by hearing, which may be conducted before the commission itself or by a member of the commission. The proceeding is then in the name of the commission against the allegedly offending municipal employer, employee, or other person, who may appear to defend; others, including the original complainant, may be admitted as interveners. A transcript of the testimony is taken. There is a right of review from the Commissioner to the commission, which may receive further testimony. If, on all the proof, the commission finds that a prohibited practice has occurred, it makes findings of fact and issues an order against the offender to cease and desist and to take such affirmative action as will comply with the provisions of § 178L, including an order for "reinstatement with or without back pay of an employee discharged or discriminated against" in violation of the first paragraph. Review of an order of the commission, available to any party aggrieved, may be had by bill in equity in the Superior Court under the State Administrative Procedure Act, c. 30A, § 14. Section 178N contains the saving clause, quoted above, relating to the Civil Service Commission and other agencies. (As noted, material changes are brought into the scheme by legislation effective July 1, 1974.)[14]

---

[13] Section 178L, first paragraph, states in part: "Municipal employers or their representatives or agents are prohibited from: — (1) interfering with, restraining or coercing employees in the exercise of the rights guaranteed in section one hundred and seventy-eight H; (2) dominating or interfering with the formation, existence or administration of any employee organization; (3) discharging or otherwise discriminating against an employee because he has signed or filed any affidavit, petition or complaint or given any information or testimony under this section; (4) refusing to bargain collectively in good faith with an employee organization which has been recognized or designated as the exclusive representative of employees in an appropriate unit; (5) refusing to discuss grievances with the representatives of an employee organization recognized or designated as the exclusive representative in an appropriate unit."

[14] Statute 1973, c. 1078, replaces c. 149, § § 178D, 178F-178N, by a new c. 150E. The changes to be noted here are that binding arbitration is in certain events

3. *Discussion.* The Legislature's attempt to solve the whole problem of the interrelation of the labor statute with the civil service law by the general saving clause of § 178N "invites litigation," as we said of a similar facile effort in *Mathewson* v. *Contributory Retirement Appeal Bd.* 335 Mass. 610, 614 (1957). As elsewhere in the field of labor law, "it . . . [becomes] the task of the courts to accommodate, to reconcile the older statutes with the more recent ones." *Boys Mkts. Inc.* v. *Retail Clerks Union, Local 770,* 398 U. S. 235, 251 (1970).

The judge below read § 178N to mean that upon a complaint by a municipal civil service employee under c. 31, § 43, that there was not just cause for his suspension (or dismissal) on the ground of alleged "insubordination," the matter was to be handled exclusively by the Civil Service Commission and the Labor Relations Commission was wholly excluded and without jurisdiction to take any action; just as such a case would be handled solely by the Civil Service Commission before the creation of the Labor Relations Commission, so, according to the judge, it must be handled now.

This seems to us not a reasonable accommodation. Neither § 178N nor any other statutory provision purports to confer "exclusive" jurisdiction on either commission. Such routing of cases involving municipal employees under civil service solely through the Civil Service Commission, while cases of municipal employees not under civil service alleging prohibited practices could move only through the Labor Relations Commission, would result in distortions and disregard of enacted law that would call in question any supposed legislative purpose to create that kind of dual system.

If the Civil Service Commission were to administer in

made available which becomes "the exclusive procedure for resolving any such grievance involving suspension, dismissal, removal or termination notwithstanding any contrary provisions of section forty-three . . . of chapter thirty-one . . ." (new c. 150E, § 8); present § 178N is repealed and not replaced; and the law treats the State and municipal spheres together. See Segal, A Preliminary Analysis of the New Public Employees' Law in Massachusetts, 18 Boston Bar J., No. 1, p. 5 (1974).

such cases only the substantive law which it has historically fashioned under the title of "just cause," and no recourse could be had there or before the Labor Relations Commission to the new labor statute in its material aspects, then a plain perversion of the legislative purpose would occur and a gulf would be created between the treatment of classified and nonclassified municipal employees that could not be justified in policy or logic. The opinion below does not disavow this result.

But if it be suggested that the Civil Service Commission should attempt in those cases to apply the labor law as well, with the Labor Relations Commission wholly excluded — a suggestion made by the appellees in their brief, although with little elaboration[15] — then there would still be a plain defiance of the definitional clause of § 178G, already quoted, joining together classified and nonclassified employees for the purposes, procedural and substantive, of the labor statute.[16]

Employees of both classes (and their employers as well) are entitled to the specialized services of the Labor Relations Commisssion in the administration of the labor rights, and to the related adjective arrangements. Considering the indissoluble linkage of the character of a tribunal, its procedure, and the substantive law that it enforces,[17] it seems clear that the parties before the Civil Service Commission would not — and in the nature of things could not — secure from that body alone substantive rights

---

[15] The lack of elaboration may be explained by the remark in the appellants' brief that "[t]o our knowledge, the Civil Service Commission has never reviewed the suspension of a civil service employee for organizational activity." On the other hand it appears that the Labor Relations Commission has handled disciplining of municipal civil service employees for union activities in violation of § 178L. See *Matter of Harwich and Harwich Police Federation*, Labor Relations Commn. No. MUP-59, decided June 5, 1969.

[16] In *Karchmar* v. *Worcester,* 364 Mass. 124 (1973), it was questioned whether the "agency service fee" provision of § 178L, first paragraph, subdivision (6), applied as well to municipal employees who had civil service status as to those who had not. After carefully examining the definitional clause of § 178G, the court held that subdivision (6) did so apply. The *Karchmar* case is further considered below.

[17] See the remarks on this point in *Alexander* v. *Gardner-Denver Co.* 415 U. S. 36, 56-58 (1974). The case is discussed below.

equivalent to those assigned by the statute for enforcement to the other commission. So the idea of using the Civil Service Commission to act as a substitute for the Labor Relations Commission in cases involving employees in the civil service would turn out to be quite unsatisfactory. It must, after all, have been a prime legislative purpose in creating the Labor Relations Commission to promote uniformity rather than disuniformity of interpretation and application of the labor law. In this light we need hardly point out that "cease and desist" and "affirmative" remedies, not only available but required in certain cases under the labor statute, could in no event attach to determinations by the Civil Service Commission, and that the nature and course of judicial review of orders of the Civil Service Commission depart from those prescribed for review of orders of the Labor Relations Commission.

In our view, the statutes can be read "so as to constitute a harmonious whole" (*Mathewson* v. *Contributory Retirement Appeal Bd., supra,* at 614) by attributing to the Legislature certain commonsense general purposes. There was a legislative design to introduce new substantive law as to the rights of municipal employees which must in ultimate effect impinge on the traditional "just cause" formula. The Civil Service Commission was to remain concerned with the functions and with protection of the interests with which it had long been associated, while the Labor Relations Commission was to be engaged in the new tasks and protection of the new interests. But neither agency should be oblivious of the actions of the other. It could follow that some marginal litigious events — relatively few in comparison with the bulk — might have to be handled by both agencies. With mutual restraint, aided by coöperation of those representing employees and employers, the two agencies could reach a fair adjustment, and the precept of § 178N would be reasonably satisfied.[18]

---

[18] To make anything turn on whether one agency has some priority in time over the other would be without support in the statutes and might encourage regrettable competitive races between the agencies.

Preliminarily we observe that it was open to the Legislature in writing the new law to prescribe, as a ground for examining, and in proper cases overturning disciplinary action by a municipal employer (as well as for securing independent relief against it), that it had engaged in a prohibited practice. This the Legislature did by means of §§ 178H and 178L. Though the new law can be thought of as amending or affecting the civil service law, with its traditional reading of "just cause," it did not exceed legislative power, or in itself qualify the policy of § 178N. Important here is *Karchmar* v. *Worcester,* 364 Mass. 124, 132-133 (1973), making both these points in respect to a 1970 amendment of § 178L which in certain events imposed on municipal employees an "agency service fee" as a condition of employment.[19]

Nor is § 178N abused when functional lines are respected within reason in the conduct of particular dismissal or suspension cases. The present case was evidently conducted on all sides without forethought as to the optimum procedure to be used, but the functional idea may still be followed to a solution. Although the charge before the Civil Service Commission was "insubordination," it was not improbable that the question of anti-union bias might come up in the unfolding of the facts as possibly qualifying or negating the charge. The record, however, does not disclose that the question did come up; if it did, there is no indication of what attention it actually received. In this situation, it would be strange indeed to say that the Labor

---

[19] "By enacting the detailed provisions of G. L. c. 31, relating to civil service employees, the Legislature did not thereby exhaust its entire power with reference to such employees. It still had and has the power to prescribe, add to, or otherwise amend the rules of eligibility for appointment, and the conditions of, or grounds for, suspension or removal from all public employment. *Nichols* v. *Commissioner of Pub. Welfare,* 311 Mass. 125, 130-131 [1942]. It may exercise that power either by amending G. L. c. 31, or by inserting appropriate provisions in other chapters of the General Laws. *Reynolds* v. *Commissioner of Commerce & Dev.* 350 Mass. 193, 194-195 [1966]. It did just that when it enacted St. 1970, c. 463, § 1, amending G. L. c. 149, § 178L, to authorize contracts requiring payment of agency service fees as a condition of public employment. This amendment, even if it be treated as giving rise to a 'just cause' for disciplinary action against a civil service employee under G. L. c. 31, § 43, as amended, did not 'diminish the authority and power of the civil service commission' within the meaning of G. L. c. 149, § 178N." *Karchmar* v. *Worcester,* 364 Mass. 124, 132-133 (1973).

Relations Commission lacked "jurisdiction" to proceed with an inquiry into anti-union bias upon a complaint before it charging a prohibited practice. This consideration is enough to dispose of the present appeal.

We think we should go on to say that, had the Civil Service Commission examined into the motivation of the suspension as a phase of the question whether the employee was in fact insubordinate, and had it ruled against the employee, then the Labor Relations Commission, in comity, could properly take the ruling of the other agency into account as support for a determination to dismiss the employee's concurrent complaint charging a prohibited practice. But the Labor Relations Commission would not be deprived of "jurisdiction," and if not satisfied that the question of anti-union bias had been sufficiently explored, could decline to dismiss, issue its own complaint, and proceed to prosecute and later grant relief which might comprehend "reinstatement" and more.[20]

Whether the Labor Relations Commission, acting within its "jurisdiction" in the present case, reached the right decision in substance, can be tested when the cause is remanded to the Superior Court and the employers' petition for review under the State Adminstrative Procedure Act is proceeded with there. If the employers succeed, the suspension stands, and no offence is given to § 178N. It is very unlikely that there can be any such offence if the employers fail and the employee's suspension is wiped out by an order for "reinstatement." This follows from two added considerations. An employer's commission of a prohibited practice usually, if not always, so far pervades and dominates a case as to call for revoking the discipline ordered by the employer even if the employee could otherwise be properly called insubordinate (and other relief, negative and affirmative, would then also be in

---

[20] Analogy can be found in the attitude of deference that may be taken by the National Labor Relations Board toward certain arbitral decisions, although it does not yield ultimate jurisdiction. See The Developing Labor Law, 488-495 (A. B. A., Section of Labor Relations Law, ed. Morris, 1971); *Yourga Trucking, Inc.* 197 N. L. R. B. No. 130, 80 L. R. R. M. 1498 (1972). Cf. n. 23 below.

order).[21] The "insubordination" that was found is not negated but may be taken to be outweighed. Second, the Labor Relations Commission operates on a basis different from that of the Civil Service Commission. The latter agency vindicates a private right of the complaining employee (although of course the right is given in part to serve a public purpose). The former agency, although stirred to action by a private complaint, acts when it chooses to do so in its own name as a public prosecutor to test a public right, with the possible remedy not limited to the grievance of the particular employee.[22]

In retrospect, considering the apparent seriousness with which the prohibited practice charge was here being pressed, one imagines that it would have been advantageous to hold the civil service proceeding in abeyance by consent or otherwise while the Labor Relations Commission acted. A finding of prohibited practice against the municipal employer would likely have ended the matter (subject to review in the Superior Court on the employer's petition); a finding by the commission for the employer on that charge (or reversal of a contrary finding on review) would leave the employee with his § 43 route to protest that he was not "insubordinate."

We have, of course, been speaking of the rare cases with potentialities of conflict between the agencies. The much

[21] This proposition is touched on in *Matter of Chicopee and Bd. of Trustees of Chicopee Municipal Home and Am. Federation of State, County and Municipal Employees and its Appropriate Affiliates, AFL-CIO,* Labor Relations Commn. No. MUP-110, decided May 14, 1971. The proposition is well developed by the National Labor Relations Board and accepted by Federal courts on review. See, e.g., *National Labor Relations Bd.* v. *Thor Power Tool Co.* 351 F. 2d 584, 587 (7th Cir. 1965), enforcing 148 N. L. R. B. 1567 (1964); *Crown Cent. Petroleum Corp.* v. *National Labor Relations Bd.* 430 F. 2d 724 , 729 (5th Cir. 1970), enforcing 177 N. L. R. B. 322 (1969); *Arbie Mineral Feed Co.* v. *National Labor Relations Bd.* 438 F. 2d 940, 942 (8th Cir. 1971), modifying and enforcing in part 182 N. L. R. B. 146 (1970); *Bettcher Mfg. Corp.* 76 N. L. R. B. 526 (1948); *New York Trap Rock Corp.* 148 N. L. R. B. 374 (1964); *Will & Baumer Candle Co. Inc.* 206 N. L. R. B. No. 120 (1973), C. C. H. Labor Law Reporter, par. 25, 995 (1974).

[22] This difference in the operations of the agencies is among the reasons why an employee's application to either agency should not be considered an "election" against or a "waiver" of resort to the other. So also it is immaterial that the employee here did not attempt judicial review of the determination of the Civil Service Commission (which, according to the judge below, the employee thought to be a futile course). See n. 23 below.

larger number will fall to one or the other as a matter of routine. In the present situation, indeed, the employee might well have applied only to the Labor Relations Commission. On a favorable decision there, he would be reinstated, and this would not interfere in any way with the Civil Service Commission, which would not have been applied to. Otherwise the suspension would stand.

While some awkwardness must be felt in those few cases where a single episode may be twice examined at the administrative level, there is in fact considerable precedent for giving the employee more than one string to his bow. Thus in the recent case of *Alexander* v. *Gardner-Denver Co.* 415 U. S. 36 (1974), the Supreme Court held that the employee could maintain an action under Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e et seq. (1970), for a discharge based on alleged racial discrimination, although he had failed in a previous arbitration under the collective bargaining agreement with his employer where he (with his union) had charged the same wrongful discrimination. Justice Powell observed that "legislative enactments in this area have long evinced a general intent to accord parallel or overlapping remedies against discrimination." *Id.* at 47. Where our statutes allow alternative remedies or avenues of relief there is perhaps less anomaly, because as we have seen the interests protected are not the same, and in the one case it is the individual, in the other an agency of the Commonwealth, that seeks vindication of the interest.[23]

4. *Conclusion.* The decree appealed from, dismissing the proceeding before the Labor Relations Commission for lack of jurisdiction, is reversed, and the cause is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[23] Justice Powell's opinion in the *Alexander* case will be found rich in suggestion about the nonapplicability of "election" and "waiver" (415 U. S. at 49-52 [1974]) and about a court's possible deference to or acceptance of findings made by the arbitrator (415 U. S. at 55-60 [1974]).