162                                                    370 Mass. 162

Director of Div. of Employee Relations *v.* Labor Relations Commission.

DIRECTOR OF THE DIVISION OF EMPLOYEE RELATIONS OF THE
DEPARTMENT OF ADMINISTRATION AND FINANCE *vs.* LABOR
RELATIONS COMMISSION & another.[1]

Suffolk.    December 3, 1975 — April 26, 1976.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, & WILKINS, JJ.

*Labor. Public Employment. Arbitration. State Labor Relations
Commision,* Order.

The Labor Relations Commission, in issuing an order that a union of
    public employees cease and desist from encouraging the illegal with-
    holding of services by the employees, was not authorized by G. L.
    c. 150E, § 9A (*b*), to add an order requiring the public employer and
    the union to submit to arbitration an alleged "hiring freeze" and
    work assignment by the employer where no arbitration had been
    applied for under the grievance provision of the collective bargain-
    ing agreement, and the commission had taken no steps concerning
    a pending charge by the union against the employer of a "prohibited
    practice" regarding the hiring freeze. [166-175]·

CIVIL ACTION commenced in the Superior Court on No-
vember 25, 1974.

The case was heard by *Good,* J.

The Supreme Judicial Court granted a request for direct
appellate review.

*Steven C. Kahn* for Labor Relations Commission.

*Warren H. Pyle* for Local 509, Service Employees Inter-
national Union, AFL-CIO.

*Mark M. Grossman,* Special Assistant Attorney General
(*William R. Blane* with him) for the Director of the Divi-
sion of Employee Relations of the Department of Adminis-
tration and Finance.


KAPLAN, J.    Suppose the Labor Relations Commission
(Commission) has properly found on complaint of a public
employer that a union of public employees instigated an

---

[1] Local 509, Service Employees International Union, AFL-CIO.

370 Mass. 162    163

Director of Div. of Employee Relations *v*. Labor Relations Commission.

illegal withholding of services by its members. May the Commission, in issuing a cease and desist order against the union, add an order requiring the parties to submit to arbitration an alleged "hiring freeze" and work assignment by the employer, when arbitration was not applied for under the grievance provision of the collective bargaining agreement, and the Commission has not proceeded with a pending "prohibited practice" complaint against the employer regarding the hiring freeze? The question is a limited one. A judge of the Superior Court held in the circumstances of the case that the added order was erroneous. We agree that it was not authorized by the statutory provision on which the Commission relied, § 9A of new c. 150E of the General Laws ("Labor Relations: Public Employees," effective July 1, 1974).

The facts appear in the stipulation of agreed facts on which the judge below acted. On March 15, 1974, the Department of Public Welfare entered into a collective bargaining agreement with Local 509, Service Employees International Union, AFL-CIO (Union), which represented the social workers employed to carry out the department's welfare program. Certain provisions of the contract (simplified) described an employee's normal caseload in an office as 120 cases and set out procedures for dealing with surplus cases. Such cases were to be first assigned on a "pro-rata overtime basis" to any employees who volunteered, but if there were insufficient volunteers or the overtime fund was temporarily depleted, the cases were to be mandatorily assigned to employees up to a maximum of 180 cases. The agreement, which was lengthy and detailed, further contained a "no strike" clause and a "grievance procedure" culminating in final and binding arbitration.

In October, 1974, some employees refused, at the urging of the Union, to handle assigned surplus cases. The Union claimed that the surplus had been generated by reductions of staff created by an administrative hiring freeze allegedly in violation of the sense, even if not the text, of the agreement. The Union, however, did not file a grievance under the arbitration provision. Instead, for reasons of its own,

164                                                      370 Mass. 162

Director of Div. of Employee Relations *v.* Labor Relations Commission.

the Union on October 23, 1974, filed a "prohibited practice" charge with the Labor Relations Commission under § 10 (*a*) (5).[2] The next day the Director of the Division of Employee Relations of the Department of Administration and Finance — the public employer for present purposes[3] — informed the Commission that an illegal strike (more properly, an illegal withholding of services) was in progress in violation of § 9A (*a*), and demanded that the Commission conduct an investigation and institute appropriate court action under § 9A (*b*) to enjoin the violation.

The Commission conducted a hearing on the Employer's petition and, on October 30, 1974, entered an order under § 9A (*b*) requiring the Union to cease and desist from encouraging or sanctioning the withholding of services by the employees. However, the order was subject to two "provided" clauses: that the disputed assignment of cases and the imposition of the hiring freeze be promptly submitted to binding arbitration pursuant to the agreement, and that the parties participate in good faith in the arbitration procedures — to which was added the "caution" that frustration of the arbitration by either party might furnish "a basis for reconsideration hereof." The parties both sought modification of the order and on November 14 the Commission issued a final revised order, set out in the margin,[4] still

---

[2] Section 10 provides in part: "(a) It shall be a prohibited practice for a public employer or its designated representative to: . . . (5) Refuse to bargain collectively in good faith with the exclusive representative as required in section six . . . ."

In its complaint the Union charged that "[t]he employer and its representative have attempted to subvert and to make impossible the performance of the 1974-1975 collective bargaining agreement between Local 509 and the Department of Public Welfare by imposing an 'administrative freeze' on the hiring of employees for the bargaining unit."

[3] The collective bargaining agreement was made by the Department of Public Welfare, the "employer" for purposes of the then existing public employees law, G. L. c. 149, § 178F. As of July 1, 1974, the Director of the Division of Employee Relations of the Department of Administration and Finance became the "employer" under the new law, G. L. c. 150E, § 1.

[4] "WHEREFORE, the Commission, upon investigation and consideration of the parties' argument, reaffirms its finding that Local 509,

370 Mass. 162                                                    165

Director of Div. of Employee Relations *v.* Labor Relations Commission.

under authority of § 9A (*b*), in which (among certain other changes) the "provided" form was dropped and good-faith arbitration was directly commanded. It is noteworthy that the Commission left hanging and took no steps concerning the prohibited practice charge.

The Commission did not immediately bring an action under § 9A (*b*) to enforce its order. Instead, the Employer sued the Commission in the Superior Court resting jurisdiction on G. L. c. 30A, § 14, and praying a modification of the order to eliminate the command that the parties submit to binding arbitration. (In fact the Employer has been willing to arbitrate the issue whether social workers could be assigned more than 120 cases, but resisted any arbitration concerning the hiring freeze.) The Commission answered and counterclaimed, naming the Union as an additional defendant to the counterclaim, and prayed enforcement of its entire final order. The Union contested the

---

Service Employees International Union, AFL-CIO has been and is engaged in encouraging and condoning the withholding of services, in violation of Chapter 150E, Section 9 (A) (a), over the Employer's assignment of surplus cases pursuant to Article VII (c) (d) (c) (2) of the parties' collective bargaining agreement, which the Union contends may be invoked only in 'exceptional' circumstances not presented herein. Accordingly, the Commission, by virtue of the power vested in it by Section 9 (A) (b) of Chapter 150E of the General Laws, HEREBY ORDERS:

"1. That Local 509, Service Employees International Union, AFL-CIO cease and desist from encouraging or sanctioning the withholding of services by social workers employed at the Department of Public Welfare;

"2. That the Employer and the Union promptly submit to binding arbitration, pursuant to Article XII of the parties' agreement, the disputed assignment of surplus cases and imposition of an alleged hiring freeze;

"3. That the Employer and the Union participate in good faith in the arbitration procedures, as required by Chapter 150E, Section 10 (a) (6) [Commission's footnote referred to §§ 10 (*a*) (6), (5), and 10 (*b*) (3)].

"4. That the Employer and the Union inform the Commission of the arbitrator selected, and the date or dates of scheduled arbitration hearings;

"5. That the Employer and the Union forward to the Commission, within ten (10) days of issuance, the arbitrator's decision and a statement which reflects whether the grievance-arbitration procedure was fair and regular and whether the award was consistent with the purposes and policies of Chapter 150E of the General Laws."

portion of the order directing it to cease and desist, but argued that the order to arbitrate was proper.

On agreed facts, the judge of the Superior Court sustained the Employer's position. He upheld the cease and desist part of the order, and struck the rest. His decision to delete the order to arbitrate went on two alternative grounds. First, the stricken provisions were not authorized by § 9A (*b*) on which the Commission had relied; it was not a "requirement" which the Commission could "set" in connection with prohibiting an illegal strike, work stoppage, slowdown, or withholding of services. Second, the basic matter commanded to be arbitrated — the imposition of a hiring freeze — was intrinsically nonarbitrable: resulting from financial stringency, it was a matter of executive and legislative decision, not amenable to review by an arbitrator. See generally Annot., 68 A.L.R.3d 885 (1976).

We took the case on request of the parties under G. L. c. 211A, § 10 (A). The Union does not now contest the cease and desist part of the order and so the sole issue on appeal is the propriety of the judge's deletion of the arbitration order. In affirming, we rest on the first ground, and do not reach or express any views about the second.

1. Section 9A (*a*) is an absolute prohibition of strikes and the like by public employees. It states: "No public employee or employee organization shall engage in a strike, and no public employee or employee organization shall induce, encourage or condone any strike, work stoppage, slowdown or withholding of services by such public employees."

By subsection (*b*) of § 9A, the Commission is directed to prevent or correct any violations it finds, after investigation, to exist: "Whenever a strike occurs or is about to occur, the employer shall petition the commission to make an investigation. If, after investigation, the commission determines that any provision of paragraph (*a*) of this section has been or is about to be violated, it shall immediately set requirements that must be complied with, including, but not limited to, instituting appropriate proceedings in the superior court for the county wherein such violation

370 Mass. 162                                                    167

Director of Div. of Employee Relations *v.* Labor Relations Commission.

has occurred or is about to occur for enforcement of such requirements."

It is argued that the power in subsection (*b*) to "immediately set requirements that must be complied with" includes the authority not only to compel employee compliance with the fundamental prohibitory rule of subsection (*a*), but also to compel action by both the Employer and the Union to resolve the dispute which appears to have occasioned the employee unrest — including, as in this case, an order for mandatory arbitration for which there is no express basis anywhere in c. 150E. We agree with the trial judge that the natural reading of subsection (*b*) is otherwise. It is not an independent provision or a global one. It is tied to subsection (*a*) and confers the specific power on the Commission immediately to set requirements to be complied with by the offending party which will eliminate the violation and which may be enforced in case of further violation by resort to the Superior Court.

If there is unclarity in the text of § 9A (*b*),[5] it is much relieved, we think, by an examination of its legislative history. The language about setting requirements can be traced to a bill (1973 House Doc. No. 6194, app. B) drafted by a special commission, with Senator George Mendonca as chairman, created to recommend changes in the statute governing labor relations in the public sector. See Res. 1969, c. 97; 1971, c. 24. This bill[6] and two others that followed[7] departed from the traditional absolute prohibition

---

[5] The language of § 9A (*b*) is somewhat garbled; it reads as if "instituting appropriate proceedings ... for enforcement of such requirements" is itself a requirement.

[6] The bill was modeled on Hawaiian legislation, Hawaii Rev. Stat. § 89-1 to § 89-20 (Supp. 1975), which granted public employees a limited right to strike. See generally *Hawaii Pub. Employment Relations Bd.* v. *Hawaii State Teachers Ass'n,* 54 Hawaii 531 (1973).

[7] 1973 Senate Doc. No. 1771; 1973 House Doc. No. 7715.

The Legislature considered five bills other than the bill proposed by the Mendonca Commission before enacting G. L. c. 150E by St. 1973, c. 1078. Two bills were virtually identical to the Mendonca Commission bill, legalizing strikes by public employees in limited situations. 1973 Senate Doc. No. 1771 and 1973 House Doc. No. 7715. Two other bills

of strikes by public employees (see *Hansen* v. *Commonwealth*, 344 Mass. 214 [1962]) and would have allowed public employees to strike if during contract negotiations an impasse continued after mediation and fact-finding stages. To meet the dangers that might arise in such situations, there was provision that if a strike endangering the public health or safety was "occurring, or about to occur," the public employer could petition the Labor Relations Commission to make an investigation, and "[i]f the Commission finds that there is imminent or present danger to the health and safety of the public, the Commission shall set requirements that must be complied with to avoid or remove any such imminent or present danger." 1973 House Doc. No. 6194, app. B, § 9 (*c*) (4). This seems clearly to mean that the Commission could specify standards that must be met by the public employees, such as maintaining a skeletal force to stay on the job, so that the services vital to health and safety would continue. That the "requirements" to be "set" did not envisage orders directed to the employer was indicated by a further provision, § 9 (*c*) (6), which would entitle the Commission to institute proceedings in the Superior Court to compel the employees or the employee organization to abide by the section, but which made no mention of enforcement proceedings against the employer.[8]

---

were very similar textually to the Mendonca Commission bill but totally proscribed strikes and slowdowns. 1973 Senate Doc. No. 1929 and 1973 House Doc. No. 7751. A fifth bill, 1973 Senate Doc. No. 1935, passed on the Senate floor, made only minor changes in the then existing public employees labor relations law, G. L. c. 149, §§ 178F-178N. The final enactment was the result of a joint conference committee's consideration of 1973 Senate Doc. No. 1935 and 1973 House Doc. No. 7751, and in most respects the language of the final enactment followed that of 1973 House Doc. No. 7751.

[8] Section 9 (*c*) (6) of the bill recommended by the Mendonca Commission provided: "[i]f any employee organization or any employee is found to be violating or failing to comply with the requirements of this section ... the Commission shall institute appropriate proceedings in the Superior Court ... to require the employee organization or employees to comply with the requirements of this section, and such court may issue such orders and decrees, by way of injunction or otherwise, as may be appropriate to enforce this section." The reference to "requirements" would seem to include not only requirements designed to

370 Mass. 162                                                  169

Director of Div. of Employee Relations *v.* Labor Relations Commission.

The intended limited scope of the "set requirements" provision is again illustrated by the fact that in another provision of the bill there was explicit authorization for the Commission to order arbitration to prevent or end a strike that endangered public safety.[9] § 9 (*d*).

The final bills[10] and the law as enacted continued to include language directing the employer to petition the Commission in case of a strike and ordering the Commission to investigate and if necessary "to set requirements that must be complied with." But because there was now a prohibition of all work stoppage, there was no need for the rest of the original language that looked to maintaining vital services. Folded into the provision was the authority for the Com-

---

remove a danger to public health or safety, but also numerous other conditions set out in the section that must be met by employees before their strike would be lawful, such as the completion of a sixty-day period after the Commission had made public the findings and recommendations of a fact-finder. The entire section was directed at limiting and channeling employee action.

[9] Several of the bills modeled on the Mendonca Commission proposal contained a section providing a special arbitration procedure for the resolution of an impasse in contract negotiations involving firefighters or police officers. The early drafts of the section, in setting out the relation of the procedure to the Commission's power to set requirements so as to remove a danger to public health and safety, clearly indicate the legislative understanding that those requirements were to be applied only to employees. For example, § 4 (*a*) of 1973 House Doc. No. 7715 provided that the special arbitration procedure would be invoked "[i]f an employee organization duly recognized as representing the firefighters or police officers of a city, town or district has been prevented by the commission, pursuant to [the section authorizing the Commission to set requirements] or by a superior court, pursuant to [the section authorizing the court to enforce limitations on strike activity], from engaging in a lawful strike because of the danger to the public health and safety." See also 1973 Senate Doc. No. 1771, § 4 (*a*).

We note that the legislation enacting c. 150E included a section, to be effective until June 30, 1977, that provides similar special arbitration procedures to end an impasse in negotiations involving firefighters and police officers. St. 1973, c. 1078, §§ 4, 8. The evidently experimental nature of the section seems to reflect the Legislature's caution and hesitation in prescribing arbitration as the uniform method for the resolution of labor disputes. See McAvoy, Binding Arbitration of Contract Terms: A New Approach to the Resolution of Disputes in the Public Sector, 72 Colum. L. Rev. 1192, 1194 (1972).

[10] 1973 Senate Doc. No. 1929 and 1973 House Doc. No. 7751; see note 7 *supra*.

mission to institute "appropriate proceedings in the superior court . . . for enforcement of such requirements." The changes mentioned leave the evident meaning of "set requirements" unchanged, which is, in short, that the Commission might require performance of the workload by public employees who had been found in violation (that is, might create a basis for punishment by the court of concerted activities preventing the attainment of the workload). For example, the Commission might initially order the Union to cease and desist from encouraging or condoning a slowdown. If the slowdown continued, the Commission could set a specified minimum amount of labor in a work period, with performance below that level figuring as a continuance of the slowdown. The same holds for a "withholding of services," and if the cease and desist order in the present case did not itself imply a level of 180 cases, that or another requirement shown to be appropriate could have been set.[11]

2. The Commission and the Union suggest that the Commission's role in dealing with strikes will be seriously diminished if it cannot attempt to resolve the underlying dispute. The suggestion has conspicuously little persuasive force in the present case because the Union had presented the heart of the dispute (as the Union saw it) to the Commission in the form of a charge of "prohibited practice" under § 10, but instead of availing itself of the opportunity, the Commission chose to disengage itself from the problem and to try to pass it to an arbitrator.[12] More generally, however, there is an underestimation of the value of § 9A (b) which looks to the intervention in a strike situation of an

---

[11] The Commission and the Employer argue that the power to set requirements also includes a power in the Commission to impose punitive sanctions against employees or an employee organization, such as withdrawal of the organization's certification. The question is not before us. It will be noted that the "requirements" of § 9A (b) are set after "investigation," while the Commission is authorized by § 11 to impose such a punitive sanction only after more formal procedural safeguards.

[12] The possible consequences, if the Commission had pursued the prohibited practice charge, are mentioned in n.15 below.

370 Mass. 162                                                171

Director of Div. of Employee Relations *v.* Labor Relations Commission.

impartial agency with specialized experience. It can be hoped that a byproduct effect of this intervention will often be a reconciliation of the parties and an end to the difficulty. Even where resort by the Commission to a court becomes necessary, the fact that it is an independent body that seeks the order, instead of the employer as before the enactment of c. 150E (see, e.g., *School Comm. of Boston* v. *Reilly,* 362 Mass. 334 [1972]; *Hansen* v. *Commonwealth,* 344 Mass. 214 [1962]; *City of Medford,* Mass. L.R.C. No. MUPL-29, 3 CCH Lab. L. Rep., State Laws par. 49,999A.50 [March 6, 1973]), is likely to make the result more acceptable to the employees.

It is argued, further, that the Legislature "unequivocally indicated its preference for arbitration ... as the desired method for resolving disputes" and hence § 9A (*b*) should be interpreted to permit the Commission to compel arbitration. The Commission's modification of its original order, which had conditioned the cease and desist provision on arbitration, was perhaps a recognition that there are some limits to the use of arbitration even on the expansive view of § 9A (*b*) that the Commission espouses. The fact is that c. 150E expresses no unrestrained preference for arbitration in the public employment situations. Although § 8 (which deals with grievance procedures) seems to regard binding arbitration as a preferred mechanism for resolution of grievances, the Commission may order arbitration only at the request of one of the parties. Moreover, the section does not authorize the Commission to supersede a multistage grievance procedure that is provided by agreement and that culminates in binding arbitration, such as existed in the present case. See *Town of Danvers,* Mass. L.R.C. No. MUP-2068 at 3, 3 CCH Lab. L. Rep., State Laws par. 49,999C.64 (December 20, 1974). Under § 9 (which deals with contract negotiation), in cases of probable impasse of union and employer in negotiating a collective agreement, either party may petition the Board of Conciliation and Arbitration to investigate and determine whether an impasse exists, and the Board may then provide a mediation and fact-finding service to bring the parties together. But arbitration to

resolve an impasse must have been "voluntarily agreed to by the parties." § 9. Despite the illegality of a strike or slowdown by public employees, it is quite conceivable that a union may use such a tactic as a means of putting pressure on the public employer during contract negotiations. An interpretation of § 9A (*b*) which would allow the Commission to compel arbitration in such a case in ending the strike would appear to be inconsistent with the legislative judgment reflected in § 9 that arbitration, if employed, should be voluntary. As we said in another case involving the Commission, we are to read the statute "so as to constitute a harmonious whole." *Dedham* v. *Labor Relations Comm'n*, 365 Mass. 392, 402 (1974), quoting from *Mathewson* v. *Contributory Retirement Appeal Bd.*, 335 Mass. 610, 614 (1957).

3. The Union argues that *Boys Mkts. Inc.* v. *Local 770, Retail Clerks*, 398 U.S. 235 (1970), a "private sector" case, teaches the proper relationship between injunctive relief to end a strike and an order to arbitrate. In *Boys Mkts.* the Court overruled its decision in *Sinclair Ref. Co.* v. *Atkinson*, 370 U.S. 195 (1962), which held that the anti-injunction provisions of the Norris-LaGuardia Act, 29 U.S.C. § 104 (1970), forbade a Federal court to enjoin a strike in breach of a no-strike provision of a collective bargaining agreement. The *Boys Mkts.* Court noted that *Sinclair* impaired the policy favoring arbitration of grievances and bred disuniformity and friction between the Federal and State forums because injunctive relief might be available in State courts. The Court held that an injunction might go against a strike in violation of a collective bargaining agreement that provided for arbitration of the dispute, but only if the employer was ordered to arbitrate. 398 U.S. at 254. See generally Axelrod, The Application of the *Boys Markets* Decision in the Federal Courts, 16 B.C. Ind. & Com. L. Rev. 893 (1975); Dawson, The Scope of the *Boys Markets* Rule, 28 Okla. L. Rev. 794 (1975). In arguing for a similar connection under § 9A (*b*) between a cease and desist order and an arbitration order, the Union is not only met with the conflicting interpretation of § 9A (*b*) developed above,

370 Mass. 162                                              173

Director of Div. of Employee Relations *v*. Labor Relations Commission.

but appears to overlook basic differences between labor relations in the private and public sectors. Whereas the strike has been a protected weapon of private-sector employees since the 1930's, public employees have not had similar artillery (see Annot., 37 A.L.R.3d 1147 [1971]) — a distinction rationalized and justified on many grounds. See, e.g., Bernstein, Alternatives to the Strike in Public Labor Relations, 85 Harv. L. Rev. 459, 462, 464-466 (1971); Wellington & Winter, Structuring Collective Bargaining in Public Employment, 79 Yale L.J. 805, 807-808 (1970); Wellington & Winter, The Limits of Collective Bargaining in Public Employment, 78 Yale L.J. 1107, 1123-1125 (1969). Thus, although in the private sector a union's contractual waiver of its statutory right to strike may be presumptively tied to the employer's acceptance of binding arbitration for resolution of contractual disputes (see *Boys Mkts.*, *supra* at 247-248; *Textile Workers Union* v. *Lincoln Mills*, 353 U.S. 448, 455 [1957]), no similar linkage exists in public sector cases.[13] The Union's reliance on private sector precedent seems, therefore, to be misplaced, and the Commission does not join in the Union's contentions in this regard.

Although holding that the Commission exceeded § 9A (*b*) in commanding arbitration, we note that arbitration could have come about on the demand of the Union under the grievance provision of the collective bargaining agreement at any time during the interval of unease over the alleged hiring freeze; such a demand is, indeed, specifically enforceable under G. L. c. 150C.[14] It might also have come

---

[13] Long before the *Sinclair* and *Boys Mkts.* cases, the anti-injunction provisions of the Norris-LaGuardia Act, 29 U.S.C. § 104 (1970), had been held inapplicable to strikes by government employees. See *United States* v. *United Mine Workers*, 330 U.S. 258, 276 (1947). Indeed Federal employee organizations are subject to a prohibition of strike activity that is similar to c. 150E, § 9A (*a*). See Exec. Order No. 11491, § 19(b)(4), 3 C.F.R. 254, 264 (1974). Our State statute that derives from the Norris-LaGuardia Act, G. L. c. 214, § 6 (see *Jones* v. *Demoulas Super Mkts. Inc.*, 364 Mass. 726 [1974]), has also been held not to bar suits to enjoin strikes by government employees. See *Hansen* v. *Commonwealth*, 344 Mass. 214, 216-220 (1962).

[14] In addition, a refusal to arbitrate as required by a collective bargaining agreement might be found to be a prohibited practice. See

about following due consideration by the Commission of the prohibited practice charge under §§ 10-11, for it appears to be open to the Commission in a proper case to retain jurisdiction of the charge but to defer action on it pending resort to arbitration. See *Cohasset School Comm.,* Mass. L.R.C. Case No. MUP-419, 3 CCH Lab. L. Rep., State Laws par. 49,999B.04 (June 19, 1973); cf. *Collyer Insulated Wire,* 192 N.L.R.B. 837 (1971).[15]

---

*Mendes* v. *Taunton,* 366 Mass. 109, 119 (1974); Note, Grievance Arbitration in the Public Sector: The New Massachusetts Law, 9 Suffolk U.L. Rev. 721, 732-735 (1975).

[15] As to disputes that underlie prohibited practice charges and appear to be arbitrable within the collective bargaining contract, the Commission has adopted a policy regarding deferral resembling the Federal policy of the *Collyer* case. See *Cohasset School Comm., supra.* In *Cohasset,* it was indicated that deferral would be considered only "[i]f, upon investigation, the charge on its merits appears to be substantiated," and would be denied "if the party against whom the charge.of prohibitive practice is made, refuses to arbitrate, raises any question as to procedure or substantive arbitrability, or delays in terms of processing the case to arbitration." Mass. L.R.C. Case No. MUP-419 at 16, 3 CCH Lab. L. Rep., State Laws par. 49,999B.04, at 61,795. The NLRB approach has been to defer only if investigation indicates the charge is not frivolous and only if the respondent is willing to go to arbitration. See *Gary-Hobart Water Corp.,* 210 N.L.R.B. No. 87, at 742 (1974) (1974 CCH NLRB Dec. par. 26,516, at 34,345), enforced, 511 F.2d 284 (7th Cir.), cert. denied, 423 U.S. 925 (1975); Memorandum of Peter Nash, NLRB General Counsel, to Regional Directors, Arbitration Deferral Policy under *Collyer* — Revised Guidelines, 4 CCH Lab. L. Rep., Labor Relations par. 9031, at 15,032-15,033, 15,042 (May 10, 1973); Isaacson & Zifchak, Agency Deferral to Private Arbitration of Employment Disputes, 73 Colum. L. Rev. 1383, 1406 (1973). The NLRB, however, will defer if the dispute is arguably arbitrable despite the respondent's intention to challenge the arbitrability of the underlying dispute in the arbitration forum. See *Urban N. Patman, Inc.,* 197 N.L.R.B. No. 150 (1972) (1972 CCH NLRB Dec. par. 24,368); Memorandum of Peter Nash, *supra* at 15,033, 15,039-15,040.

Here the Commission did not undertake an investigation of the prohibited practice charge and we can only speculate what might have happened if the charge was found to have merit. The Commission now states that it might relax the *Cohasset* guidelines and defer pursuant to an "arguably arbitrable" standard like that of the NLRB, but it does not advert to the fact that the NLRB would evidently not defer where the party resists any arbitration concerning the underlying dispute. See Memorandum of Peter Nash, *supra* at 15,033; cf. *Typographical Union No. 101,* 220 N.L.R.B. No. 144 (1975) (1975-1976 CCH NLRB Dec. par. 16,244); *Typographical Union No. 101,* 219 N.L.R.B. No. 18 (1975) (1974-1975 CCH NLRB Dec. par. 16,000).

Chapter 150E is a new and experimental statute. Section 9A is experimental like the rest. Nothing in this opinion vouches for its ultimate wisdom. If experience shows that there is a real need for enlargement of the Commission's authority under § 9A, the remedy is to be sought in another place.

*Judgment affirmed.*