INTERNATIONAL ORGANIZATION OF MASTERS, MATES AND
PILOTS, ATLANTIC AND GULF MARITIME REGION, AFL-CIO
*vs.* WOODS HOLE, MARTHA'S VINEYARD AND
NANTUCKET STEAMSHIP AUTHORITY.

Suffolk. March 7, 1984. — August 16, 1984.

Present: HENNESSEY, C.J., WILKINS, LIACOS, & ABRAMS, JJ.

*Arbitration,* Collective bargaining. *Public Employment,* Collective bargain-
ing. *Statute,* Construction. *Labor,* Collective bargaining. *Words,*
"Grievance," "Dispute."

Chapter 760 of the Acts of 1962, which provides that the Woods Hole,
Martha's Vineyard and Nantucket Steamship Authority shall be subject
to certain provisions of the State labor relations law, did not require
either the authority or a union representing certain of its employees to
submit issues unresolved by collective bargaining to final and binding
arbitration under the jurisdiction of the Board of Conciliation and Arbit-
ration. [812-819]

CIVIL ACTION commenced in the Superior Court Department
on April 13, 1983.

The case was heard by *Morse,* J.

The Supreme Judicial Court granted a request for direct
appellate review.

*James T. Grady* for the plaintiff.

*Laurence S. Fordham* for the defendant.

*Richard J. Lettieri, Richard F. Meyer, Michael R. Brown,
Andrew L. Eisenberg & Mary L. Marshall,* for Massachusetts
Port Authority, amicus curiae, submitted a brief.

LIACOS, J. The International Organization of Masters, Mates
and Pilots, Atlantic and Gulf Maritime Region, AFL-CIO
(union), filed a complaint in the Superior Court in Suffolk
County seeking to compel the Woods Hole, Martha's Vineyard
and Nantucket Steamship Authority (Authority) to submit all
unresolved issues in their contract negotiations to final and

binding arbitration under the jurisdiction of the Board of Conciliation and Arbitration (Board).[1] A judge of the Superior Court denied, as matter of law, the union's complaint and concluded that c. 760 of the Acts of 1962 (c. 760), did not require the Authority to submit to interest arbitration.[2]

The union is the bargaining representative of certain employees of the Authority, a public instrumentality established by c. 701 of the Acts of 1960. An existing agreement between the parties was to expire on April 15, 1982. The parties commenced negotiations to reach a new agreement in January, 1982. They were unsuccessful in resolving certain issues that would enable them to execute a new written agreement. In March, 1983,[3] the union requested that the Board institute an arbitration procedure to settle the existing controversies between the parties. The Board sought to schedule an arbitration hearing; however, the Authority refused to submit to arbitration, questioning the Board's jurisdiction under c. 760. The union then instituted this action to compel arbitration. Following the entry of judgment for the Authority, the union appealed. We granted the union's application for direct appellate review.

The single issue presented to us is whether the Superior Court judge erred in concluding that c. 760 did not require the Authority to submit all issues unresolved by collective bargaining to final and binding arbitration under the jurisdiction of the Board. The union contends that both the language of the statute and the objectives underlying its enactment demon-

[1] The union instituted this action for declaratory relief and to compel arbitration pursuant to G. L. c. 150C, § 2, and G. L. c. 231A, § 1. The union did not allege that its agreement with the Authority contained an arbitration provision which the Authority violated in refusing to submit to this arbitration. It appears that the action was improperly instituted under G. L. c. 150C, § 2, which gives the Superior Court judge the power to enforce agreements to arbitrate as described in G. L. c. 150C, § 1.

[2] By its terms, this statute also applies to the Massachusetts Turnpike Authority, the Massachusetts Port Authority, and the Massachusetts Parking Authority. The Massachusetts Port Authority has submitted a brief, amicus curiae, in support of the position of the Steamship Authority.

[3] The earlier agreement had been extended. The Authority exercised its right to terminate the extension agreement on March 23, 1983.

strate that the Legislature intended the law to mandate interest arbitration. The Authority maintains that a reading of c. 760, and an examination of the collective bargaining rights of public employees and the role of interest arbitration at the time of the statute's enactment, will not sustain this interpretation. Furthermore, the Authority claims that construing the statute to require interest arbitration would result in an unconstitutional delegation of legislative authority. We conclude that c. 760 does not require the Authority or the union to submit to interest arbitration.[4] Therefore, we affirm the decision of the judge of the Superior Court.

The familiar rule of statutory construction requires us to interpret a law so as to effectuate the intent of the Legislature in enacting it. *Hanlon* v. *Rollins,* 286 Mass. 444, 447 (1934). The intent of the Legislature is to be determined primarily from the words of the statute, given their natural import in common and approved usage, and with reference to the conditions existing at the time of enactment. *Pacific Wool Growers* v. *Commissioner of Corps. & Taxation,* 305 Mass. 197, 198-199 (1940). This intent is discerned from the ordinary meaning of the words in a statute considered in the context of the objectives which the law seeks to fulfil. *Randall's Case,* 331 Mass. 383, 385 (1954). Wherever possible, we give meaning to each word in the legislation; no word in a statute should be considered superfluous. See *Casa Loma, Inc.* v. *Alcoholic Beverages Control Comm'n,* 377 Mass. 231, 234 (1979).

The relevant portion of c. 760, § 1, provides that "[t]he employees of [the steamship authority] shall submit all grievances and disputes to arbitration, pursuant to the arbitration provisions in agreements existing at the time of the passage of this act or subsequently entered into with said authorities, or in the absence of such provisions with the state board of conciliation and arbitration . . . whose decisions shall be final and binding." The statute provides no definition for the terms "grievance" or "dispute."

---

[4] Consequently, we need not consider the constitutional arguments raised by the Authority.

The definition of a "grievance" is usually determined by the subjective provisions of a collective bargaining agreement. The term has been regularly used to describe a formal complaint by an employee relating to the interpretation or application of terms in an existing collective bargaining agreement. See F. Elkouri & E.A. Elkouri, How Arbitration Works 109 (3d ed. 1973).

The union contends that the common usage and ordinary meaning of the word "dispute" evinces the intention of the Legislature to provide for compulsory interest arbitration in this enactment.[5] "Dispute" is defined merely as "a verbal controversy." Webster's Ninth New Collegiate Dictionary 366 (1983). However, the word "dispute," as used in our laws in the context of labor relations, has not been given a clear or consistent definition. The General Court has used the term "dispute" to refer to a broad range of matters in the labor relations sector, including those concerning "the interpretation or application of such [collective bargaining agreement]," G. L. c. 150E, § 8, as amended by St. 1978, c. 393, § 39 (chapter prescribing labor relations for public employees); and "any controversy concerning rates of pay, wages, hours or terms . . . or conditions of employment," G. L. c. 150B, § 2, inserted by St. 1947, c. 596 (defining "[l]abor dispute" in a statute regu-

---

[5] We do not agree with the Authority's claim that c. 760 presupposes the existence of a collective bargaining agreement. The statute states that the grievance or dispute shall be submitted to arbitration either "pursuant to the arbitration provisions in agreements" entered into with the Authority or "in the absence of such provisions" directly with the board. St. 1962, c. 760, § 1. Thus, the statute indicates only that it will honor arbitration provisions setting forth specific procedures for the resolution of labor management controversies where they exist in collective bargaining agreements. But see Rep. A.G., Pub. Doc. No. 12, at 92, 93-94 (1959) (construing identical language in St. 1956, c. 465, § 24, Enabling Act of Massachusetts Port Authority, to require the existence of a collective bargaining agreement before party may submit controversy to Board). The Attorney General construed § 24 as requiring the port authority to enter into collective bargaining agreements with union representing its employees, based on the declaration of labor relations policy included in the statute. Id. at 94. See St. 1956, c. 465, § 24. Cf. St. 1962, c. 760 (statute contains no declaration of policy regarding execution of agreements).

lating peaceful settlement of industrial disputes injurious to public health and safety). See also G. L. c. 150A, § 9A (*b*), as appearing in St. 1969, c. 133, § 2 (defining "dispute" between health care facility and union representing employees as "all other controversies," other than "grievances," "including, but not limited to, controversies . . . arising in the course of negotiation [of] . . . terms or conditions" in a collective bargaining agreement). In other statutes, as well as in our case law, the word "dispute" is used interchangeably with "grievance." Neither term is defined, and both terms are used to refer to a controversy which triggers labor unrest between an employer and a union. See *Director of the Div. of Employee Relations of the Dep't of Admin. & Fin.* v. *Labor Relations Comm'n,* 370 Mass. 162, 167 (1976); *Morceau* v. *Gould-National Batteries, Inc.,* 344 Mass. 120, 126 (1962). See also G. L. c. 161A, §§ 19, 19A.[6]

Where there exists an ambiguity in statutory language, we will examine the historical and legal environment in which the statute was enacted to discern the objectives which the Legislature expected the law to achieve. See *Chouinard, petitioner,* 358 Mass. 780, 782 (1971). Cf. *Director of the Div. of Employee Relations of the Dep't of Admin. & Fin.* v. *Labor Relations Comm'n, supra.*

When, in 1962, the enactment of c. 760 required the Authority and its employees to comply with certain provisions of the State labor relations statute (G. L. c. 150A), public employees only recently had been afforded the right to bargain collectively.

---

[6] One of the commonly utilized treatises on arbitration, F. Elkouri & E.A. Elkouri, How Arbitration Works, *supra,* does not define consistently the term "dispute." In one portion of the treatise, the authors describe a dispute as involving "demands for changes in the terms of a collective bargaining agreement" and a controversy "arising out of representation issues," and state that such matters are not generally considered "grievances." See *id.* at 109 (contrasting definition of "grievance" with other types of controversies). In other portions of the treatise, the authors use the term "dispute" generically to refer to matters in controversy between an employer and a union relating to the parties' rights, the interpretation or application of provisions in agreements, and the arbitrability of such matters. *Id.* at 44, 47, 64-65 & n.79.

When the predecessor to the Authority was created as a public instrumentality in 1948, it had no obligation to bargain with its employees. See St. 1948, c. 544, §§ 3, 5 (*h*); St. 1960, c. 701, § 16. Not until 1964 were employees of the Authority given the right to form and to join unions for the purpose of improving their working conditions. See St. 1964, c. 637, and St. 1965, c. 763, § 2, inserting G. L. c. 149, §§ 178F-178N, repealed by St. 1973, c. 1078, § 1; St. 1973, § 2, inserting G. L. c. 150E.

The traditional rule has been that public employees were prohibited from striking. *Director of the Div. of Employee Relations of the Dep't of Admin. & Fin.* v. *Labor Relations Comm'n, supra* at 167-168. Statute 1962, c. 760, § 1, reaffirmed that rule as to the employees of the Authority. An earlier act gave the Commonwealth the power to intervene in, and to attempt to resolve, a labor dispute between the Authority and its employees, which resulted in a stoppage or slowdown of steamship transportation. See St. 1954, c. 449; G. L. c. 150B, §§ 1-8.

We consider whether the Legislature intended c. 760 to require the Authority and its employees to submit to mandatory interest arbitration against this background of limited employee rights in the public sector when c. 760 was enacted. Interest arbitration involves the settlement of terms and conditions of employment to be included in a collective bargaining agreement. See *School Comm. of Boston* v. *Boston Teachers Local 66*, 372 Mass. 605, 606 n.4 (1977). "Rights" arbitration, by contrast, relates to controversies over the interpretation or application of a particular labor law or a provision in a collective bargaining agreement. F. Elkouri & E.A. Elkouri, *supra* at 47. Although "rights" disputes generally are amenable to resolution through arbitration, "interests" controversies are not so easily settled, given the absence of established principles and guidelines to assist an arbitrator in deciding which substantive provisions should be included in an agreement. *Id.* at 48, 51. Because use of interest arbitration also may impede the development of a healthy labor-management relationship fostered through collective bargaining, we have stated that there is "an

understandable attitude of wariness about [compelling interest] arbitration." *School Comm. of Boston* v. *Boston Teachers Local 66, supra* at 613.

When c. 760 was enacted, the Commonwealth had no law which required interest arbitration. In fact, the majority of State statutes providing for compulsory interest arbitration were not enacted until the late 1960's or early 1970's. See McAvoy, Binding Arbitration of Contract Terms: A New Approach to the Resolution of Disputes in the Public Sector, 72 Colum. L. Rev. 1192, 1193 & nn. 9 & 10 (1972). Mandating interest arbitration by enactment of c. 760 thus would have triggered a radical change in existing labor laws and policies. We will not interpret a statute, unclear on its face, to require a drastic alteration in existing law unless we can discern that the Legislature intended to achieve this result. See *Dexter* v. *Commissioner of Corps. & Taxation,* 316 Mass. 31, 53 (1944).[7]

---

[7] The union argues that the statute which created the Metropolitan Transit Authority elucidates the Legislature's intent to have c. 760 avoid potential strikes by providing for compulsory interest arbitration. Statute 1947, c. 544, § 19, contained language identical to c. 760 concerning the employees' obligation to "submit all grievances and disputes to arbitration." The union claims that we interpreted § 19 as providing for mandatory arbitration in *Hansen* v. *Commonwealth,* 344 Mass. 214, 220 (1962), decided shortly before c. 760 was enacted. The union concludes, therefore, that when the Legislature used the identical language in the arbitration clause of c. 760, it adopted the same judicial construction. See *Rugg* v. *Town Clerk of Arlington,* 364 Mass. 264, 266-267 (1973).

The union's argument is not substantiated by the *Hansen* case. Section 19 merely provided that, with respect to specific terms and conditions of employment, the laws relating to street railway companies, rather than those governing public employees, shall apply. See St. 1947, c. 544, § 19. It also ensured that any employee who, without his consent, was transferred from other public carriers to work on the transit authority would retain the same position, compensation, and benefits.

In *Hansen* v. *Commonwealth, supra,* we decided only that the Anti-Injunction Act, G. L. c. 214, § 9A, did not apply to any public employees, including those in the employ of the transit authority, thereby reaffirming the principle that public employees have no right to strike. *Id.* at 218-219. We did not hold that § 19 required interest arbitration. Subsequently, we confirmed that a statute should not be construed to require interest arbitration merely because public employees do not have the right to strike. Only in the private sector may binding arbitration be considered presumptively a quid pro quo for a union's relinquishing its statutorily guaranteed right to

Our conclusion that the Legislature did not intend c. 760 to require interest arbitration is also supported by the enactment, subsequently, of statutes which expressly provided for mandatory interest arbitration and which required an adherence to detailed and specific procedures in pursuing this course of settlement. General Laws c. 161A, §§ 19, 19C-19G, which regulate labor relations between the MBTA and unions representing its employees, provide, inter alia, that interest arbitration can be sought only after the parties have attempted unsuccessfully to resolve their dispute through mediation and after the mediator has certified the existence of an impasse. This statute also includes procedures for the selection of an arbitrator and dictates guidelines for the arbitrator to follow in rendering the award. G. L. c. 161A, §§ 19D-19G.[8] Cf. *Local 589, Amalgamated Transit Union* v. *Massachusetts Bay Transp. Auth., ante* 407, 412-413 & n.1 (1984). Statute 1973, c. 1078, § 4 (repealed by St. 1980, c. 580, § 10), also specifically provided for interest arbitration pursuant to detailed procedures when a union representing fire fighters or police officers reached an impasse in negotiations with a municipality. Cf. G. L. c. 150A, § 9A (*a*) (setting forth circumstances when health care facility and union representing its employees may be required to submit unresolved grievance or dispute to arbitration); G. L. c. 150E, § 9 (detailing procedures for voluntary interest arbitration following impasse in negotiations between public employer and public employees' union).

These statutes demonstrate that when the Legislature intends to require interest arbitration, it does so clearly and specifically, providing clear and detailed guidelines for conducting the arbitration process. In the absence of language expressly providing

---

strike. See *Director of the Div. of Employee Relations of the Dep't of Admin. & Fin.* v. *Labor Relations Comm'n, supra* at 173.

[8] Given the inclusion, for the first time, of these detailed procedures which the Legislature deemed necessary for parties to follow in pursuing interest arbitration, the absence of these procedures in c. 760 and the absence of any interest arbitration statutes in this State in 1962, it is clear that the Legislature did not intend to provide for this method of dispute resolution in c. 760.

392 Mass. 811                                          819

Int'l Org. of Masters, etc. *v.* Woods Hole, Martha's Vineyard & Nantucket Steamship Authority.

for interest arbitration, or procedures which prescribe how such arbitration is to be conducted, we will not construe c. 760 to require this method of dispute resolution.

This conclusion also is in harmony with our previous decision in *Director of the Div. of Employee Relations of the Dep't of Admin. & Fin.* v. *Labor Relations Comm'n,* 370 Mass. 162 (1976), where we refused to interpret G. L. c. 150E, §§ 9, 9A (*b*), as requiring interest arbitration between public employers and unions representing their employees. See *id.* at 171-172.[9] General Laws c. 150E, § 9, as amended through St. 1979, c. 594, § 1, sets forth a procedure whereby parties can attempt to resolve an impasse in contract negotiations either by petitioning the Board "to initiate fact-finding proceedings," or by mutual agreement, "petition[ing] the board for arbitration." Examining the legislative history of G. L. c. 150E, we noted that the enactment included a special compulsory arbitration procedure only where there existed an impasse in contract negotiations involving fire fighters or police officers. *Id.* at 169 n.9. We reasoned that "[t]he evidently experimental nature of the section seems to reflect the Legislature's caution and hesitation in prescribing arbitration as the uniform method for the resolution of labor disputes." *Id.* We thus concluded that the Legislature intended any arbitration procedure invoked under G. L. c. 150E, § 9, to be voluntarily entered into by the parties.[10] *Id.* at 172.

---

[9] General Laws c. 150E, § 2, which gives public employees organizational and bargaining rights, also prohibits work stoppages and strikes and enables the labor relations commission to "set requirements" to avoid or stop an unlawful withholding of services. See G. L. c. 150E, § 9A (*b*), inserted by St. 1973, c. 1078, § 2.

[10] The Legislature's caution in providing for compulsory interest arbitration is consonant with well established labor policy which favors the resolution of disputes by collective bargaining between employer and union. See *NLRB* v. *American Nat'l Ins. Co.,* 343 U.S. 395, 401-402 (1952). Federal courts have sought to promote this policy of dispute settlement by holding unlawful the imposition of compulsory interest arbitration in unsuccessful contract negotiations and by ruling that an interest arbitration clause is a nonmandatory subject of bargaining. See *Sheet Metal Workers' Int'l Ass'n, Local 252* v. *Standard Sheet Metal, Inc.,* 699 F.2d 481, 484 (9th Cir.

We conclude that St. 1962, c. 760, does not mandate interest arbitration, and we affirm the judgment of the Superior Court.

*So ordered.*

1983); *NLRB* v. *Massachusetts Nurses Ass'n,* 557 F.2d 894, 898 (1st Cir. 1977); *General Elec. Co.* v. *Callahan,* 294 F.2d 60, 67 (5th Cir. 1961).