Filed 5/15/26

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)


| | |
|---|---|
| DEPARTMENT OF HUMAN RESOURCES et al., <br>     Plaintiffs and Respondents, <br><br> v. <br><br> CALIFORNIA CORRECTIONAL PEACE <br> OFFICERS ASSOCIATION, <br>     Defendant and Appellant. | C100353 <br><br> (Super. Ct. No. <br> 34202200327434CUPAGDS) |


APPEAL from a judgment of the Superior Court of Sacramento County, Christopher E. Krueger, Judge. Reversed with directions.

Janice R. Shaw, Karly K. McCrory, Suzanne L. Jiminez, Anthony P. Donoghue and Jennifer Ragan; Benedon & Serlin, Gerald M. Serlin and Judith E. Posner for Defendant and Appellant.

Frolan R. Aguiling, Sandra L. Lusich, Christopher E. Thomas, David M. Villalba and Ronald Pearson for Plaintiffs and Respondents.

J. Felix De La Torre, Joseph W. Eckhart, James E. Coffey and Christina M. Nielsen for Public Employment Relations Board as Amicus Curiae.


Tracylyn Lopez (Lopez), a correctional officer and union representative at Salinas Valley State Prison (the prison), received a notice of adverse action for directing

1

profanity at two other officers.[1]  She later posted materials from the disciplinary action on a union bulletin board near the main entrance to the prison.  The posted materials revealed the nature of the discipline against Lopez, and the unique surnames of the other officers.

Department of Corrections and Rehabilitation and Department of Human Resources (collectively, CDCR) suspended Lopez for 60 workdays for the posting.  Lopez appealed the discipline to the State Personnel Board (SPB), arguing the posting served as commentary on CDCR's disciplinary practices, and was thus protected by the First Amendment.  She also filed a contractual grievance alleging the discipline violated the memorandum of understanding (MOU) between respondent California Correctional Peace Officers Association (CCPOA) and the State of California, which incorporates the Ralph C. Dills Act (Gov. Code, § 3512 et seq.; Dills Act) and prohibits retaliation for engaging in protected activities.[2]  CCPOA, which represents correctional officers, sought arbitration of the grievance on Lopez's behalf.  This appeal arises at the intersection between these proceedings.

The SPB ruled for CDCR in October 2020.  The SPB acknowledged Lopez's right to express opinions about disciplinary matters, but found the posting fostered a "code of silence," and thus constituted an inexcusable neglect of duty and failure of good behavior (§ 19572, subds. (d) & (t)), which justified the 60-workday suspension.[3]  Whether the

---

[1] Lopez is not a party to this appeal.

[2] Undesignated statutory references are to the Government Code.

[3] The code of silence is an unwritten rule that correctional officers do not report on misconduct by other officers.  (See generally *Madrid v. Gomez* (E.D.Cal. 1995) 889 F.Supp. 1146, 1156 [describing the "unwritten but widely understood code" designed to "encourage prison employees to remain silent regarding the improper behavior of their fellow employees, particularly where excessive force has been alleged"].)

discipline constituted retaliation for engaging in protected activity under the MOU and Dills Act was not an issue before the SPB. That issue was reserved for the arbitration proceedings, which took place some 18 months later.

An arbitrator entered an award in favor of Lopez and CCPOA in June 2022. The arbitrator sustained the grievance, finding CDCR violated the MOU by discriminating and interfering with protected speech and representational activity. She rejected CDCR's argument that Lopez lost any potential protection by promoting an unlawful objective (i.e., fostering the code of silence). She also found CDCR punished Lopez for the protected activity, and failed to show it would have imposed the same penalty regardless of that protected activity. Accordingly, the arbitrator ordered CDCR to rescind the notice of adverse action for the posting, make Lopez whole by issuing backpay and restoring any other benefits and rights lost as a result of the 60-workday suspension, and post a notice at the prison stating CDCR discriminated and interfered with Lopez's and CCPOA's protected union activities under the MOU. In so doing, the arbitrator effectively offset the 60-workday suspension reviewed and approved by the SPB.

CDCR filed a petition to vacate or correct the arbitration award. (Code Civ. Proc., §§ 1285, 1286.2, & 1286.6.) CCPOA responded with a counter petition to confirm the award. (Code Civ. Proc., § 1285.) The trial court denied CDCR's petition to vacate the arbitration award and CCPOA's counter petition to confirm the award. However, the trial court granted CDCR's petition to correct the award and struck the portion ordering CDCR to rescind the notice of adverse action for the posting and make Lopez whole by issuing backpay and restoring any other benefits and rights lost as a result of the suspension.

CCPOA appeals, arguing the trial court erred in granting CDCR's alternative petition to correct the award. Specifically, CCPOA argues the trial court erred in concluding the arbitrator exceeded her powers in entering the award, and thus lacked statutory authority to correct it. We agree. Accordingly, we will reverse the judgment

3

denying the petition to confirm the arbitrator's award and granting the petition to correct the award, and remand with instructions to enter a new judgment confirming the award as issued by the arbitrator.

## I. BACKGROUND

*A. The Underlying Disciplinary Disputes*

Lopez has worked as a correctional officer at the prison since 2002. She also serves as a job steward and union representative for CCPOA. As a correctional officer, Lopez receives regular training on ethics and professionalism, which includes admonitions against the code of silence.

Lopez had a conversation with two officers in June 2017, in which she described them as " 'assholes' " and said "they were on her 'shit list.' " Correctional officers are expected to refrain from using profanity at the prison. Nevertheless, rough language is commonly used in conversation between them.

Lopez received a notice of adverse action for discourteous treatment of the other officers in October 2017. It was unusual for correctional officers to be disciplined for using profanity, and Lopez believed she was singled out for being an active and outspoken union job steward. She appealed the notice of adverse action to the SPB, and the matter was eventually settled with the issuance of a letter of reprimand in January 2018. But that was not the last word on the subject.

On July 13, 2018, Lopez posted excerpts of materials from the disciplinary action on a CCPOA bulletin board near the main entrance to the prison. The bulletin board was accessible to inmate workers and Lopez knew the posted materials would be visible to them. She redacted her first name and highlighted several paragraphs, which included the unique surnames of the other officers involved in the profanity incident. The materials remained on the bulletin board for several days.

On July 18, 2018, then-Warden Shawn Hatton asked Lopez to remove the posting from the bulletin board. Hatton believed the posting was inappropriate because the

4

highlighted materials could be understood to suggest the named officers played some role in causing Lopez to be disciplined.  Lopez removed the posting and Hatton declined to initiate disciplinary proceedings against her.  Hatton retired soon thereafter.

Former Warden Hatton was succeeded by Warden Tammy Foss.  Foss learned that Lopez had not been disciplined for the posting incident and sought permission to file a direct action without investigation.

Lopez received a notice of adverse action for the posting incident in July 2019. The notice of adverse action charged Lopez with inexcusable neglect of duty, willful disobedience, other failure of good behavior, and unlawful retaliation against any other state officer or employee.[4]  (§ 19572, subds. (d), (o), (t), & (x).)  CDCR also suspended Lopez for 60 workdays, effective September 3, 2019.  Lopez appealed the notice of adverse action to the SPB in September 2019.

B.    *The Grievance*

Lopez is a member of State Bargaining Unit 6, which covers state correctional employees.  (*Stoetzl v. Department of Human Resources* (2019) 7 Cal.5th 718, 730.) Members of State Bargaining Unit 6 are represented by the CCPOA.  (*Ibid.*)  The terms and conditions of their employment are governed by memoranda of understanding between CCPOA and the State, such as the MOU.[5]

Lopez filed a grievance on her own behalf in December 2019.  Lopez alleged the notice of adverse action violated section 5.03 of the MOU, which provides, in part:  "(A)

---

[4] CDCR served Lopez with an amended notice of adverse action on August 7, 2019.  The changes are not relevant to any issue before us.

[5] There are several such memoranda of understanding; we are concerned with the MOU effective from July 3, 2019, through July 2, 2020.  (*Stoetzl v. Department of Human Resources, supra*, 7 Cal.5th at p. 730.)

5

The State and the Union shall not impose or threaten to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise to interfere with, restrain or coerce employees because of their exercise of rights guaranteed by the Ralph C. Dills Act.  [¶]  (B) The State shall not impose or threaten to impose reprisals on the Union, to discriminate against the Union, or otherwise to interfere with, restrain, or coerce the Union because of the exercise of rights guaranteed to it by the Ralph C. Dills Act. [¶]  (C)  The requested remedy for alleged violations of this section shall be through the grievance and arbitration procedure contained in this MOU."

Section 5.03 of the MOU further provides:  "Should the grievance eventuate in arbitration, the Arbitrator's decision and award shall be final and binding on all the parties.  The Arbitrator shall have full authority to grant any appropriate remedy, including, but not limited to, a remedy or award which a [Public Employment Relations Board (PERB)] Administrative Law Judge could grant."

CCPOA requested arbitration of the grievance.

C.      *The Unfair Labor Charge and PERB Complaint*

CCPOA filed an unfair practice charge with PERB in January 2020.  The unfair practice charge alleged CDCR retaliated against Lopez for engaging in protected activity under the Dills Act.  PERB thereafter issued an administrative complaint against CDCR, also alleging violations of the Dills Act.  The complaint was placed in abeyance pending the outcome of the arbitration proceedings.

D.      *The SPB Proceedings*

An evidentiary hearing was held before an administrative law judge (ALJ) for the SPB in February 2020.  CDCR argued Lopez made the posting to retaliate against the other officers for reporting her use of profanity, thereby promoting the code of silence. CCPOA, on Lopez's behalf, argued the posting was intended to alert correctional officers they could be disciplined for using profanity at work, which was commentary protected by the First Amendment.

6

The ALJ issued a proposed decision and order in April 2020. The ALJ found Lopez lacked any retaliatory intent in posting the disciplinary materials, and only meant to share that she had been disciplined for using profanity. Nevertheless, the ALJ recognized that CDCR has "a significant interest in eliminating employee speech that may discourage reporting potential misconduct." Accordingly, the ALJ rejected CCPOA and Lopez's First Amendment defense, and recommended sustaining the charge for failure of good behavior and reducing the suspension from 60 to 20 workdays.

The SPB rejected the ALJ's proposed decision in October 2020. The SPB adopted the ALJ's factual findings and legal conclusions but reasoned Lopez knew she had a duty to refrain from conduct that promotes the code of silence, and "certainly knew" that failing to redact the surnames of the other officers "would reasonably cause others to view them negatively." "After all," the SPB said, "use of profanity whether in jest or with heated intent is somewhat conventional within the prison setting. Officers who report on such commonplace transgressions would not necessarily be viewed in the most positive light. To the contrary, others may reasonably be hesitant to work with these officers, and some may even harass or ridicule them for being 'snitches' or 'rats.' "

According to the SPB, the "likely, if not intended consequence" of revealing the other officers' surnames "was to identify them as the officers who were responsible for reporting [Lopez's] discourteous comments." That conduct placed them "in the unenviable position of losing trust and support from others," which threatened their safety "and the overall security of the institution." Under the circumstances, the SPB concluded Lopez's conduct constituted an inexcusable neglect of duty and failure of good behavior, which justified CDCR's original penalty of a 60-workday suspension.

(§ 19572, subds. (d) & (t).)  Accordingly, the SPB reinstated the 60-workday suspension.[6]

### E.    The Arbitration Proceedings

Arbitration proceedings were held over the course of two days in March 2022. The arbitrator framed the question presented as whether CDCR violated section 5.03 of the MOU in actions relating to Lopez.  The arbitrator answered that question in the affirmative, and entered an award in favor of Lopez and CCPOA in June 2022.

The arbitrator reviewed transcripts of the SPB proceedings and determined that Lopez made the posting to "show other unit members that management was charging employees with conduct that is common, making unwarranted assumptions, and imposing excessive penalties that it later agreed to substantially reduce or withdraw."  "Speaking with other employees about disciplinary actions is protected," the arbitrator observed.

While acknowledging the SPB's determination that the posting had " 'the likely, if not intended, consequence' " of identifying the other officers, the arbitrator noted the SPB "did not view the conduct under the analysis of the Dills Act's protected rights.  Its lens was focused on cause for discipline in a legal framework that excluded consideration of protected union or concerted activit[ies]."  Analyzing the conduct under the Dills Act framework, the arbitrator concluded the posting was protected activity that was neither false nor so opprobrious as to lose its protected status.

The arbitrator next considered CDCR's motive for disciplining Lopez.  As before, CDCR argued it had a legitimate business reason for disciplining Lopez; namely,

---

[6] According to CCPOA's request for judicial notice, which we hereby grant, Lopez challenged the SPB's decision by filing a petition for writ of mandate in Sacramento Superior Court.  (*Lopez v. State Personnel Board* (Super. Ct., Sacramento County, 2024, No. 34202180003625CUWMGDS.)  The petition was denied and Lopez has appealed the denial to this court.  (*Lopez v. State Personnel Board,* C101414.)

combatting the code of silence.  The arbitrator acknowledged CDCR's duty to combat the code of silence, but found evidence of retaliatory motive and antiunion animus in emails from Warden Foss.[7]  She also found the charge and penalty "suspiciously high, given the lack of investigation."[8]

The arbitrator concluded CDCR failed to show the 60-day suspension was issued in the good faith belief that Lopez made the posting in retaliation against the other officers, and CDCR would have issued the same suspension regardless of protected activity.  Having so concluded, the arbitrator sustained the grievance and ordered CDCR to vacate and rescind the notice of adverse action and make Lopez whole by issuing backpay and restoring any other benefits and rights lost as a result of the suspension.[9]

---

[7] In one such email, Foss wrote:  " 'When [Lopez] received her adverse action she highlighted the officers' names and hung it on the CCPOA board . . . . [The prison] already has the reputation of "green wall" and this is exactly the type of behavior that adds to that fire and one I am trying very hard to get rid of[.]  [¶]  She is a union rep, people listen to her and she harmed her own people.' "  In another, Foss said:  " '[I]f things are ever going to change at [the prison] the[n] people like Lopez needs [sic] to be held accountable, she is very powerful here and runs B yard. . . .  My pending action is 60 day [sic] suspension.  [¶]  She is one is [sic] the bad culture of this institution and is a Union Rep.' "  In the arbitrator's view, these emails showed "the animus of Warden Foss to a powerful Union representative who had criticized and successfully challenged disciplinary actions."

[8] The arbitrator pointed to the fact that former Warden Hatton chose not to initiate discipline against Lopez, while Warden Foss, "who was particularly concerned that [Lopez] was a powerful Union representative, not only assumed without interviewing or investigating [Lopez] that she was acting in retaliation, but increased the penalty to the maximum suspension."  In the arbitrator's view:  "The huge discrepancy between the reactions of the two wardens weighs heavily against the assertion that Foss would have suspended [Lopez] for 60 days if not motivated in part by [Lopez's] Union activity."

[9] The arbitrator also ordered CDCR to post a notice at the prison stating it discriminated and interfered with Lopez and CCPOA's protected speech and representational activity, in violation of the MOU, and would cease and desist from disciplining employees in retaliation for protected activities and interfering with CCPOA's right to represent its members.  CDCR does not challenge this aspect of the award.

*F.    The Petition and Counter Petition*

CDCR filed its petition to vacate or correct the arbitration award in September 2022. The petition alleged the arbitrator exceeded her authority and violated public policy by issuing an award that interfered with SPB's constitutional duty to review disciplinary action. The petition also alleged the award interfered with CDCR's duty to combat the code of silence. CCPOA filed its counter petition to confirm the arbitration award in January 2023.

*G.    The Trial Court Proceedings*

The trial court heard argument on the petition and counter petition in November 2023. During the hearing, the trial court accepted that the SPB and arbitration proceedings considered different legal issues, and could thus reach different conclusions as to whether Lopez and CCPOA were entitled to relief. Thus, the SPB could conclude the posting was cause for discipline under the Civil Service Act, and the arbitrator could conclude the same discipline interfered with protected activity, in violation of the MOU and the Dills Act. But the trial court was less certain whether the arbitrator could enter an award that purported to "vacate," "veto," or "rescind" discipline that had been reviewed and upheld by the SPB.

The trial court determined the arbitrator lacked authority to enter such an award in an order entered after argument. The trial court reasoned: "Allowing an arbitrator to reverse disciplinary actions approved by SPB based on collective bargaining laws and/or MOU provisions would prioritize those labor laws governing state employee conduct generally when there is nothing in those statutory schemes that indicates such an intention by the Legislature. It would also undermine the core authority of the SPB. There is simply no statutory authority in the Dills Act giving an arbitrator such review authority over SPB decisions." Accordingly, the trial court denied CDCR's petition to

10

vacate the arbitration award, denied CCPOA's counter petition to confirm the award, and granted CDCR's petition to correct the award by striking that portion directing CDCR to vacate or rescind the notice of adverse action against Lopez and make her whole by issuing backpay and restoring any other benefits and rights lost as a result of the suspension.

The trial court entered judgment for CDCR in January 2024. This appeal timely followed.

## II. DISCUSSION

### A. Applicable Law and Standard of Review

"The scope of judicial review of arbitration awards is extremely narrow." (*Department of Personnel Administration v. California Correctional Peace Officers Assn.* (2007) 152 Cal.App.4th 1193, 1200.) This is especially true in the context of labor arbitration. "California has a strong public policy favoring collective bargaining agreements in the public employment sector [citation], and in reviewing arbitration awards in the labor-management field, courts are more restricted in their power to vacate than in other types of arbitration." (*Paramount Unified School Dist. v. Teachers Assn. of Paramount* (1994) 26 Cal.App.4th 1371, 1385; see also *Southwest Regional Council of Carpenters v. Drywall Dynamics, Inc.* (9th Cir. 2016) 823 F.3d 524, 530 ["Because of the centrality of the arbitration process to stable collective bargaining relationships, courts reviewing labor arbitration awards afford a 'nearly unparalleled degree of deference' to the arbitrator's decision"].)

Courts are authorized to vacate an arbitration award if it was: "(1) procured by corruption, fraud, or undue means; (2) issued by a corrupt arbitrator; (3) affected by prejudicial misconduct on the part of the arbitrator; or (4) in excess of the arbitrator's powers." (*Richey v. AutoNation, Inc.* (2015) 60 Cal.4th 909, 916 (*Richey*); see Code Civ. Proc., § 1286.2.) The court may correct (as opposed to vacate) an award where "[t]here was an evident miscalculation of figures or an evident mistake," "[t]he arbitrators

11

exceeded their powers but the award may be corrected without affecting the merits of the decision," or "[t]he award is imperfect in a matter of form, not affecting the merits of the controversy." (Code Civ. Proc., § 1286.6, subds. (a)-(c); see also *Richey, supra*, at p. 916.)

"Arbitrators may exceed their powers by issuing an award that violates a party's unwaivable statutory rights or that contravenes an explicit legislative expression of public policy." (*Richey, supra*, 60 Cal.4th at p. 916; see also *Cotchett, Pitre & McCarthy v. Universal Paragon Corp.* (2010) 187 Cal.App.4th 1405, 1416 (*Cotchett, Pitre & McCarthy*) ["An arbitrator may exceed her powers within the meaning of [Code Civ. Proc., § 1286.2] by issuing an award that violates an explicit legislative expression of public policy"].) "But this is the exception, not the rule: 'Absent a clear expression of illegality or public policy undermining this strong presumption in favor of private arbitration, an arbitral award should ordinarily stand immune from judicial scrutiny.' " (*Cotchett, Pitre & McCarthy, supra*, at p. 1417, quoting *Moncharsh v. Heily & Blasé* (1992) 3 Cal.4th 1, 32; see also *City of Palo Alto v. Service Employees Internat. Union* (1999) 77 Cal.App.4th 327, 334 (*City of Palo Alto*) ["The normal rule of limited judicial review cannot be avoided except in those rare cases where 'according finality to the arbitrator's decision would be incompatible with the protection of a statutory right' or where the award contravenes 'an explicit legislative expression of public policy' "].)

" 'Arbitrators do not ordinarily exceed their contractually created powers simply by reaching an erroneous conclusion on a contested issue of law or fact, and arbitral awards may not ordinarily be vacated because of such error, for " '[t]he arbitrator's resolution of these issues is what the parties bargained for in the arbitration agreement.' " ' " (*Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1360-1361.) So long as an issue is " 'within the scope of the controversy submitted to the arbitrators,' " the arbitrator's resolution to that issue is " ' "what the parties bargained for in the arbitration agreement." ' " (*Alexander v. Blue Cross of California* (2001) 88

12

Cal.App.4th 1082, 1089, italics omitted.)  Thus, arbitrators do not exceed their powers when they decide "an issue [they were] clearly authorized to decide."  (*Kahn v. Chetcuti* (2002) 101 Cal.App.4th 61, 66.)

"On appeal, we review de novo a trial court's decision on undisputed facts to confirm, correct or vacate an arbitration award."  (*Taska v. The RealReal, Inc.* (2022) 85 Cal.App.5th 1, 9.)  We likewise review de novo the question whether an arbitrator's award contravenes an unwaivable statutory right or public policy.  (*Department of Human Resources v. International Union of Operating Engineers* (2020) 58 Cal.App.5th 861, 873 (*International Union of Operating Engineers*) ["In determining whether an arbitration award contravenes public policy, we review the trial court's decision de novo"]; see also *W.R. Grace & Co. v. Rubber Workers* (1983) 461 U.S. 757, 766 ["the question of public policy is ultimately one for resolution by the courts"].)  However, we "pay substantial deference to an arbitrator's determination of his own authority" (*Delaney v. Dahl* (2002) 99 Cal.App.4th 647, 655) and resolve any doubts about the arbitrator's power to decide an issue in the arbitrator's favor (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 372-373).

B.     *The Public Policy Exception*

CDCR argues the award violates public policy by: (1) interfering with the SPB's constitutional authority to review disciplinary actions; and (2) undermining efforts to combat the code of silence.  Do either of the asserted policies require correction of the award?  To answer that question, it helps to take a closer look at the public policy exception.

As previously discussed, an arbitrator may exceed their powers by issuing an award that violates a party's unwaivable statutory rights or that contravenes an explicit legislative expression of public policy.  (*Richey, supra*, 60 Cal.4th at p. 916.)  "Vacating an arbitration award based on public policy or a statutory right requires an explicit legislative expression of a public policy violated by the award or a conflict with a

13

statutory scheme. Otherwise, courts are reluctant to invalidate an arbitrator's award because 'the Legislature has already expressed its strong support for private arbitration and the finality of arbitral awards in title 9 of the Code of Civil Procedure.' " (*SunLine Transit Agency v. Amalgamated Transit Union, Local 1277* (2010) 189 Cal.App.4th 292, 303.) "The public policy so contravened must be a 'well defined and dominant' public policy as 'ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests." ' " (*Hochariw v. FJM Private Mortgage Fund, LLC* (2022) 83 Cal.App.5th 893, 899 (*Hochariw*), quoting *W.R. Grace & Co. v. Rubber Workers, supra*, 461 U.S. at p. 766; see also *Cotchett, Pitre & McCarthy, supra*, 187 Cal.App.4th at p. 1417 [the public policy exception applies where " 'a clear expression of illegality or public policy' " undermines the presumption in favor of arbitration].) A public policy is violated, for example, when arbitration is prohibited by a statutory public policy (see, e.g., *Board of Education v. Round Valley Teachers Assn.* (1996) 13 Cal.4th 269, 287-288 [affirming order granting petition to vacate arbitration award that conflicted with school district's statutory rights under the Education Code]), when an arbitration award would enforce an illegal contract (see, e.g., *Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 453 (*Jordan*) [affirming order granting petition to vacate arbitration award that would constitute an unconstitutional gift of public funds]), or when an arbitration award contravenes an existing judicial injunction (*City of Palo Alto, supra*, 77 Cal.App.4th at pp. 339-340 [reversing order confirming arbitrator's award of unconditional reinstatement where returning to work would require employee to violate injunction]).

Importantly, the public policy exception requires that the *award itself* conflict with an expression of public policy. (See, e.g., *City of Palo Alto, supra*, 77 Cal.App.4th at pp. 339-340; *City of Richmond v. Service Employees Internat. Union, Local 1021* (2010) 189 Cal.App.4th 663, 671 (*City of Richmond*); *SingerLewak LLP v. Gantman* (2015) 241 Cal.App.4th 610, 625 (*SingerLewak*).) *City of Palo Alto* illustrates this idea. There, an

14

employee of the City of Palo Alto (City) and member of the Service Employees International Union (Union) was terminated for threatening to shoot one of his coworkers. (*City of Palo Alto, supra*, at pp. 331-332.) The City also obtained an injunction prohibiting the employee from having any contact with his coworker. (*Ibid.*)

The employee appealed the termination, and the matter was referred to arbitration. (*City of Palo Alto, supra*, 77 Cal.App.4th at p. 332.) The arbitrator determined the termination failed to comply with procedures required by the collective bargaining agreement between the Union and the City. (*Id.* at p. 333.) The arbitrator also opined that the employee's threats were " 'taken out of context,' " and questioned the coworker's motivations in reporting them. (*Id.* at p. 332.) The arbitrator ordered the employee reinstated with backpay, and the City petitioned to vacate the award as violative of public policy. (*Id.* at p. 333.) The trial court denied the petition and the Court of Appeal reversed. (*Id.* at p. 340.)

On appeal, the City argued the arbitrator's award violated two public policies. (*City of Palo Alto, supra*, 77 Cal.App.4th at pp. 334 & 338.) First, the City argued the award violated the public policy requiring employers to provide employees with a safe workplace. (*Id.* at p. 334.) The Court of Appeal agreed that selected provisions of the Labor Code and Code of Regulations collectively express "an explicit public policy requiring employers to take reasonable steps to provide a safe and secure workplace." (*Id.* at pp. 336-337.) However, the City failed to show the public policy entailed "the obligation to automatically fire any employee who makes a threat of violence regardless of the employee's intent in uttering it and the actual risk to workplace safety and regardless of the procedural guarantees secured by collective bargaining and set forth in a memorandum of understanding between a union and a city." (*Id.* at p. 337.) Put another way, the City failed to show reinstatement was "necessarily incompatible with the public policy requiring employers to provide a safe workplace." (*Id.* at p. 338.) The court

15

therefore rejected the City's argument that the arbitrator's award violated the public policy requiring employers to provide a safe workplace.  (*Ibid.*)

The City had more success with its second argument: that the arbitrator's award would result in a violation of the injunction, which would in turn violate the public policy requiring obedience to judicial orders.  (*City of Palo Alto, supra*, 77 Cal.App.4th at pp. 338-340.)  The Court of Appeal agreed, stating:  "We see no way that the arbitrator's award reinstating [the employee] could have been put into operation without [the employee] disobeying the . . . injunction.  Thus, the arbitration award of unconditional reinstatement was irreconcilable with the public policy requiring obedience to court orders, especially an injunction issued pursuant to Code of Civil Procedure section 527.8."  (*Id.* at pp. 339-340.)

Other courts have similarly concluded that the award itself must be incompatible with public policy.  (See, e.g., *City of Richmond, supra*, 189 Cal.App.4th at p. 671 ["The relevant question, however, is not whether there is a public policy against sexual harassment generally but whether according finality to the arbitrator's decision would be incompatible with that public policy"]; *SingerLewak, supra*, 241 Cal.App.4th at p. 625 ["even if legally insupportable, the award itself—enforcing a non-compete agreement among partners—was not against public policy or unauthorized"]; cf. *Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173* (9th Cir. 1989) 886 F.2d 1200, 1215 ["the critical inquiry is not whether the underlying act for which the employee was disciplined violates public policy, but whether there is a public policy barring *reinstatement* of an individual who has committed a wrongful act"].)

From these authorities, we conclude that the public policy exception entails a two-part analysis.  First, we must identify an "explicit," "clear," or "well defined and dominant" expression of public policy.  (*Richey, supra*, 60 Cal.4th at p. 916; *Jordan, supra,* 100 Cal.App.4th at p. 452; *Hochariw, supra*, 83 Cal.App.5th at p. 899.)  Second, we must determine whether the award itself, rather than the underlying acts or conduct,

16

contravenes that policy. (*Richey, supra*, at p. 916; *City of Palo Alto, supra*, 77 Cal.App.4th at p. 338; *City of Richmond, supra*, 189 Cal.App.4th at p. 671.) We tackle these questions next.

      1.      *The Public Policy Expressed in Article VII, Section 3, Subdivision (a) of the California Constitution[10]*

CDCR argues the award violates public policy by interfering with SPB's constitutional authority to review disciplinary actions. CCPOA and PERB as amicus curiae respond that SPB has constitutional authority to review disciplinary actions under the State Civil Service Act (§ 18570 et seq.) (the Civil Service Act), but PERB has jurisdiction to determine whether discipline was imposed as retaliation for activities protected by the Dills Act. As such, they argue PERB could remedy violations of the Dills Act by ordering the offending party to cease and desist without undermining the SPB's authority. (§ 3514.5, subd. (c).) Taking the argument a step further, CCPOA asserts an arbitrator, authorized by agreement to exercise a PERB ALJ's remedial powers, could also remedy violations of the Dills Act by issuing a cease and desist order, as happened here.[11] (§ 3514.5.)

Neither party squarely addresses the questions, which we deem dispositive, whether article VII, section 3, subdivision (a)'s instruction to "review disciplinary actions" constitutes an "explicit," "clear," or "well defined and dominant" expression of public policy, and if so, whether the arbitrator's award contravenes that policy. (*Richey, supra*, 60 Cal.4th at p. 916; *City of Palo Alto, supra*, 77 Cal.App.4th at p. 338; *Jordan, supra*, 100 Cal.App.4th at p. 452; *City of Richmond, supra*, 189 Cal.App.4th at p. 671; *Hochariw, supra*, 83 Cal.App.5th at p. 899.) We conclude the award does not contravene

---

[10] Undesignated article references are to the California Constitution.

[11] PERB, for its part, describes the issue as "unsettled."

any explicit, clear or well-defined expression of public policy set forth in article VII, section 3, subdivision (a). To explain why, we pause again to describe the differing roles and responsibilities of the SPB and PERB.

### a. The SPB and the Merit Principle

The SPB is "a statewide administrative agency which is created by, and derives its adjudicatory power from, the state Constitution." (*Department of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 823.) "Article VII of the California Constitution provides that, generally, the civil service includes 'every officer and employee of the State' (*id.*, art. VII, § 1, subd. (a)) and that permanent appointment and promotion in the civil service 'shall be made under a general system based on merit ascertained by competitive examination' (*id.*, art. VII, § 1, subd. (b)). This constitutional mandate, known as the 'merit principle,' was adopted by California voters in 1934 in an effort to eliminate the 'spoils system' of political patronage from state employment and to ensure that 'appointments and promotions in state service be made solely on the basis of merit.' [Citations.] Another constitutional provision, also adopted in 1934, calls for a nonpartisan personnel board (the SPB) to enforce the civil service statutes (Cal. Const., art. VII, §§ 2, 3, subd. (a)) and for an executive officer to administer the statutes under the SPB's rules (*id.*, §§ 2, subd. (c), 3, subd. (b))." (*California State Personnel Bd. v. California State Employees Assn., Local 1000, SEIU, AFL-CIO* (2005) 36 Cal.4th 758, 764-765, fn. omitted.)

We are concerned here with article VII, section 3, subdivision (a), which provides: "The board shall enforce the civil service statutes and, by majority vote of all its members, shall prescribe probationary periods and classifications, adopt other rules authorized by statute, and *review disciplinary actions*." (Italics added.) Our Supreme Court has explained that the SPB's authority to review disciplinary actions is a " 'necessary counterpart' " to its power to administer the merit principle. (*State Personnel Bd. v. Department of Personnel Admin.* (2005) 37 Cal.4th 512, 526 (*State*

18

*Personnel Bd. v. Department of Personnel Admin.*); see also *International Union of Operating Engineers, supra*, 58 Cal.App.5th at p. 875 ["the merit principle is implicated not only in decisions to hire or promote state employees, but also in decisions to impose discipline"].)  Again, CDCR argues the award interferes with the SPB's constitutional authority to review disciplinary actions.  CDCR does not argue the award offends the merit principle.

          *b.*     *PERB and the Dills Act*

PERB serves a different purpose.  (*Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 196-198 (*Pacific Legal Foundation).*  Founded as the Educational Employment Relations Board in 1975, and renamed two years later, PERB administers and enforces California's public sector collective bargaining statutes, including the Dills Act.  (See *City of San Jose v. Operating Engineers Local Union No. 3* (2010) 49 Cal.4th 597, 603-604; see also *Visalia Unified School Dist. v. Public Employment Relations Bd.* (2024) 98 Cal.App.5th 844, 863, fn. 25 (*Visalia*).)  The Dills Act guarantees the collective bargaining rights of civil service employees by making it unlawful for state employers to impose reprisals or discriminate against them for exercising rights under the Act.  (§ 3519, subd. (a).)[12]

The Dills Act " 'vests broad jurisdiction in [PERB] to investigate and act upon unfair labor charges and alleged violations of the Act.' " (*California Assn. of Professional Scientists v. Schwarzenegger* (2006) 137 Cal.App.4th 371, 380 (*California Assn. of Professional Scientists*).)  To this end, section 3514.5, subdivision (c) authorizes PERB to "issue a decision and order directing an offending party to cease and desist from

---

[12] Section 3519, subdivision (a) provides, in pertinent part:  "It shall be unlawful for the state to do any of the following:  [¶] (a) Impose or threaten to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise to interfere with, restrain, or coerce employees because of their exercise of rights guaranteed by this chapter."

the unfair practice and to take such affirmative action, including, but not limited to, the reinstatement of employees with or without back pay, as will effectuate the policies of this chapter."

The arbitrator appears to have relied on section 3514.5, subdivision (c) in making the award. CDCR questions the arbitrator's ability to stand in the shoes of a PERB ALJ but does not challenge the legality of the MOU. (Cf. *California State Personnel Bd. v. California State Employees Assn., Local 1000, SEIU, AFL-CIO*, *supra*, 36 Cal.4th at pp. 763-764, 772, 775-776 [the Department of Personnel Administration and California State Employees Association were properly enjoined from implementing collective bargaining agreements that relied on "post and bid" programs for hiring and promotion, in violation of the merit principle]; *State Personnel Bd. v. Department of Personnel Admin., supra*, 37 Cal.4th at pp. 516, 519 [affirming grant of writ petitions prohibiting enforcement of MOUs that allowed civil service employees to bypass the SPB by pursuing an alternative grievance/arbitration procedure].)[13]

### c. The Relationship Between the SPB and PERB

Our Supreme Court considered the relationship between the SPB and PERB in *Pacific Legal Foundation, supra*. There, the petitioners, a public law organization and employee organization, brought mandamus proceedings against the SPB and PERB (among others), challenging the constitutionality of the State Employer-Employee Relations Act (SEERA) (Stats. 1977, ch. 1159, § 4), the predecessor to the Dills Act. (*Pacific Legal Foundation, supra*, 29 Cal.3d at p. 174.) As relevant here, the petitioners argued SEERA was unconstitutional on its face because PERB's jurisdiction to remedy unfair practices under SEERA conflicted with the SPB's jurisdiction to " 'review disciplinary actions' " under article VII. (*Pacific Legal Foundation, supra*, at p. 175.)

---

[13] We discuss *State Personnel Bd. v. Department of Personnel Admin.* at length later in this opinion.

The *Pacific Legal Foundation* court rejected the petitioners' facial challenge, stating, "PERB and the [SPB] are not in competition with each other; rather, each agency was established to serve a different, but not inconsistent purpose." (*Pacific Legal Foundation, supra*, 29 Cal.3d at p. 197.) The court elaborated: "The [SPB] was granted jurisdiction to review disciplinary actions of civil service employees in order to protect civil service employees from politically partisan mistreatment or other arbitrary action inconsistent with the merit principle embodied in article VII." (*Id*. at pp. 197-198.) "PERB, on the other hand, has been given a somewhat more specialized and more focused task: to protect both employees and the state employer from violations of the organizational and collective bargaining rights guaranteed by SEERA. Although disciplinary actions taken in violation of SEERA would transgress the merit principle as well, the Legislature evidently thought it important to assign the task of investigating potential violations of SEERA to an agency which possesses and can further develop specialized expertise in the labor relations field." (*Id.* at p. 198.)

The *Pacific Legal Foundation* court recognized that PERB's jurisdiction to investigate and remedy unfair labor practices might occasionally overlap with the SPB's jurisdiction to "review disciplinary actions." (*Pacific Legal Foundation, supra*, 29 Cal.3d at p. 197.) In that circumstance, the court said, "familiar rules of construction counsel our court to attempt to harmonize the disparate procedures, rather than simply to invalidate one or the other on broad constitutional grounds." (*Ibid*.) The court referred to out-of-state and federal authorities articulating principles for resolving conflicts between civil service agencies and public employment relations boards, stating "any conflicts which may arise in this area can be resolved either by administrative accommodation between the two agencies themselves or, failing that, by sensitive application of evolving judicial principles." (*Id.* at p. 200, fn. omitted, citing *Town of Dedham v. Labor Relations* (1974) 365 Mass. 392, 312 N.E.2d 548 (*Dedham*), *City of Hackensack v. Winner* (1980) 82 N.J. 1, 410 A.2d 1146 (*Hackensack*), and *City of Albany v. Public Employment*

21

*Relations Board* (1977) 57 A.D.2d 374, 395 N.Y.S.2d 502 (*Albany*). The court had no occasion to apply these principles, however, as "no actual jurisdictional conflict" had been presented. (*Pacific Legal Foundation, supra*, at p. 200.)

Similar issues arose in *State Personnel Bd. v. Fair Employment & Housing Com.* (1985) 39 Cal.3d 422 (*Fair Employment & Housing Com.*) in which disappointed applicants for civil service employment filed complaints with the Department of Fair Employment and Housing (DFEH) and Fair Employment and Housing Commission (FEHC) claiming they were denied positions with the California Highway Patrol due to physical disability discrimination. (*Id.* at p. 426.) The SPB sought an injunction to prevent the DFEH and FEHC from exercising jurisdiction over the applicants' claims. (*Ibid.*) The trial court enjoined DFEH and FEHC from adjudicating the claims based on "article VII of our Constitution, which it interpreted as granting to the [SPB] 'exclusive jurisdiction' over all matters involving state civil service employees." (*Id.* at p. 427.) The *Fair Employment & Housing Com.* court disagreed. (*Ibid.*)

Reaffirming the reasoning of *Pacific Legal Foundation*, the court explained: "Just as the 'merit principle' is not infringed upon by the institution of collective bargaining, so it is unharmed by the watchdog functions of the fair employment agencies. Indeed, the principle of nondiscrimination reinforces the merit principle. The [Fair Employment and Housing Act] guarantees that nonmerit factors such as race, sex, physical handicap, and the like, play no part in the appointment of civil service employees." (*Fair Employment & Housing Com., supra*, 39 Cal.3d at pp. 438-439.) The court thus concluded that the Legislature could constitutionally establish other agencies, such as those established by the Fair Employment and Housing Act (§ 12900 et seq.; FEHA), "whose specialized watchdog functions might involve consideration of matters also within the purview of the [SPB]." (*Id.* at p. 439.) Reprising *Pacific Legal Foundation*, the court said, " '[w]e should be reluctant to construe article VII, section 3, subdivision (a) in a manner that would deprive all state civil service employees of the important safeguards afforded by

these specialized agencies.' " (*Ibid.*, quoting *Pacific Legal Foundation, supra*, 29 Cal.3d at p. 199.)

As before, the court recognized that the SPB's jurisdiction to review disciplinary actions could potentially lead to conflicts with other agencies. (*Fair Employment & Housing Com., supra*, 39 Cal.3d at pp. 437-438 [summarizing *Pacific Legal Foundation*'s discussion of PERB and the SPB and noting "the two jurisdictions overlap in certain areas, such as where a disciplinary action is alleged to have been motivated by antiunion animus"].) The court clarified that *Pacific Legal Foundation* considered two types of potential conflicts: (1) where "an action by another agency actually encroaches on the merit principle, as where hiring or promotion is determined on the basis of political partisanship," and (2) "where two agencies arrive at conflicting adjudications concerning the same set of facts." (*Id.* at p. 442, citing *Pacific Legal Foundation, supra*, 29 Cal.3d at pp. 185 & 200.) Having determined that administrative enforcement of FEHA was not inconsistent with the merit principle, the court turned to the second type of conflict, "where two agencies arrive at conflicting adjudications concerning the same set of facts." (*Fair Employment & Housing Com., supra*, at p. 442.)

Here again, the court suggested that conflicting adjudications could be resolved through administrative accommodation or judicial determination. (*Fair Employment & Housing Com., supra*, 39 Cal.3d at p. 442.) The court explained: "Should the parties be unable to reach an administrative accommodation, and should the FEHC sustain the DFEH's accusation of discrimination, the conflict would have to be resolved 'by sensitive application of evolving judicial principles,' as noted by this court in *Pacific Legal Foundation.*" (*Ibid*.) The court again referred to *Dedham*, *Hackensack*, and *Albany* as guidance for resolving the problem of conflicting adjudications, but again had "no occasion to resolve that problem here since no conflicting adjudications are

23

presented." (*Id.* at pp. 442-443; see *id.* at p. 442, fn. 20, citing *Dedham*, *Hackensack*, and *Albany*.)[14]

Pacific Legal Foundation and *Fair Employment & Housing Com.* support CCPOA's position that the SPB has jurisdiction to review disciplinary actions under the Civil Service Act, while PERB has jurisdiction to determine whether the discipline was imposed for activities protected by the Dills Act. (*Pacific Legal Foundation, supra*, 29 Cal.3d at pp. 197-198; *Fair Employment & Housing Com., supra*, 39 Cal.3d at pp. 438-439.) That scenario could well result in conflicting adjudications, which may be resolved through "administrative accommodation" or "sensitive application of evolving judicial principles." (*Pacific Legal Foundation, supra*, at p. 200; *Fair Employment & Housing Com., supra*, at p. 442.) Of course, we are faced with a different problem. Unlike *Pacific Legal Foundation* and *Fair Employment & Housing Com.,* we are concerned here with overlapping adjudications between the SPB, on the one hand, and an arbitrator, on the other. Our Supreme Court has not confronted that exact scenario. However, the court addressed related issues in *State Personnel Bd v. Department of Personnel Admin.*

> d.       State Personnel Bd. v. Department of Personnel Admin.

State Personnel Bd. v. Department of Personnel Admin. concerned MOUs that allowed civil service employees to challenge disciplinary actions either by seeking review before the SPB or by filing grievances before an MOU-created agency, which could then be appealed to an arbitrator. (*State Personnel Bd. v. Department of Personnel Admin., supra*, 37 Cal.4th at p. 522.) The question presented was whether the MOUs "altered review of state civil service disciplinary actions in such a way as to violate section 3, subdivision (a) of article VII . . . providing that the [SPB] 'shall . . . review

---

[14] No conflicting adjudications were presented because the FEHC, though prepared to adjudicate the claims of the disappointed applicants, had not actually done so. (*Fair Employment & Housing Com., supra*, 39 Cal.3d at p. 442.)

disciplinary actions'?" (*Id*. at pp. 522-523.) The court concluded they did. (*Id.* at p. 523.)

The *State Personnel Bd. v. Department of Personnel Admin.* court began by distinguishing *Pacific Legal Foundation* and *Fair Employment and Housing Com.* (*State Personnel Bd. v. Department of Personnel Admin., supra*, 37 Cal.4th at pp. 525-526.) In those cases, the court said, "the Legislature's grant of certain functions to an administrative agency was consistent with advancing the merit principle embodied in article VII of our state Constitution, and in neither case did the statutory scheme undermine or compromise the [SPB]'s jurisdiction to 'review disciplinary actions' [citation] against state civil service employees." (*Id.* at p. 525.) Here, by contrast, the MOUs allowed state employees to bypass the SPB in favor of another grievance/arbitration procedure, thereby supplanting the SPB. (*Id.* at p. 526.) The court explained: "[W]hen a state civil service employee is *removed* from employment, the interest of the [SPB] in ensuring that the disciplinary action does not violate the merit principle is just as great as when an employee is *selected* for state civil service employment. And discipline other than removal from civil service also implicates the merit principle because disciplinary actions in general can have a profound effect on an employee's chance of future advancement within the merit-based civil service." (*Ibid*.)

The court continued: "It would be inimical to California's constitutionally mandated merit-based system of civil service, which is administered by the [SPB], to wholly divest that board of authority to review employee disciplinary actions in favor of an MOU-created review board. This is so because a state civil service based on the merit principle can be achieved only by developing and consistently applying uniform standards for employee hiring, promotion, and discipline. By vesting in the nonpartisan [SPB] the *sole* authority to administer the state civil service system (. . . art. VII, § 3), our state Constitution recognizes that this task must be entrusted to a *single* agency, the constitutionally created [SPB]. Because employee discipline is an integral part of the

civil service system, the [SPB]'s *exclusive* authority to review disciplinary decisions is a critical component of the civil service system." (*State Personnel Bd. v. Department of Personnel Admin., supra*, 37 Cal.4th at pp. 526-527.)

The Department of Personnel Administration argued the MOUs did not implicate the merit principle, because an employee who opts for review by an MOU-created agency would merely waive the right to seek review before the SPB. (*State Personnel Bd. v. Department of Personnel Admin., supra*, 37 Cal.4th at p. 527.) The court rejected this argument, noting the merit principle serves the general public, and "the public in general has a strong interest in ensuring that partisanship plays no role in selection and advancement within the state civil service." (*Ibid.*) The court elaborated: "That public interest would be subverted if various ad hoc arbitral boards, operating beyond the control of the [SPB] and not bound to apply its merit-based standards, could review and reverse disciplinary actions taken against state civil service employees. As we have explained, the public interest in a merit-based civil service is best served by recognizing that the [SPB]'s authority to review employee discipline is exclusive." (*Ibid.*) The court therefore concluded that MOU provisions allowing disciplined employees to bypass review by the SPB in favor of an MOU-created agency would offend the merit principle. (*Ibid.*)

CDCR places heavy reliance on *State Personnel Bd. v. Department of Personnel Admin.* Specifically, CDCR argues the award allowed CCPOA and Lopez to "bypass" the SPB's decision, and emphasizes the high court's admonition that the merit principle "would be subverted if various ad hoc arbitral boards . . . could review and reverse disciplinary actions taken against state civil service employees." (*State Personnel Bd. v. Department of Personnel Admin., supra*, 37 Cal.4th at p. 527.) We acknowledge that *State Personnel Bd. v. Department of Personnel Admin.* presents parallels with our case, and the court's admonition appears at first blush to support judicial review of the

26

arbitrator's award. Looking more closely, however, we find *State Personnel Bd. v. Department of Personnel Admin.* distinguishable.

For one thing, the MOUs in *State Personnel Bd. v. Department of Personnel Admin.* were challenged by way of petitions for writ of mandate and peremptory writ. (*State Personnel Bd. v. Department of Personnel Admin., supra*, 37 Cal.4th at p. 519.) Those petitions placed directly at issue "whether the MOU[]s and their implementing legislation violate the state Constitution." (*Id.* at p. 523.) Here, of course, we are only charged with deciding whether the arbitrator exceeded their powers by entering an award that contravenes an explicit expression of public policy. These are very different inquiries.

*State Personnel Bd. v. Department of Personnel Admin.* is also distinguishable on the facts. Unlike the MOUs at issue in *State Personnel Bd. v. Department of Personnel Admin.*, the MOU here does not give civil service employees the option to "bypass" the SPB in favor of an MOU-created agency or procedure. (*State Personnel Bd. v. Department of Personnel Admin., supra*, 37 Cal.4th at pp. 516-520.) CCPOA and Lopez were not free to choose either arbitration or the SPB. To the contrary, they were obliged to challenge the cause for the discipline under the Civil Service Act in the SPB proceedings, and the retaliatory or discriminatory nature of the discipline under the MOU and the Dills Act in arbitration. (Compare *State Personnel Bd. v. Department of Personnel Admin., supra*, at p. 527 ["Because employee discipline is an integral part of the civil service system, the [SPB's] *exclusive* authority to review disciplinary decisions is a critical component of the civil service system"] and *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, 201 ["The [SPB] is the administrative body charged with the enforcement of the Civil Service Act, including the review of punitive action taken against employees"]; with § 3514.5 ["The initial determination as to whether the charges of unfair practices are justified, and, if so, what remedy is necessary to effectuate the purposes of this chapter, shall be a matter within the exclusive jurisdiction of [PERB]"];

27

*California Assn. of Professional Scientists, supra*, 137 Cal.App.4th at p. 381 [" 'The assignment of exclusive initial jurisdiction in section 3514.5 to [PERB] means that the only forum to pursue a cause of action for violation of the statutory rights conferred in the Dills Act is before [PERB]' "]; see also § 3514.5, subd. (a) [grievances may be submitted to binding arbitration].)  And that is precisely what happened.

Lopez appeared before the SPB, and the SPB reviewed the disciplinary action against her, consistent with its constitutional duty.  CCPOA then presented claims for violations of the MOU and the Dills Act to the arbitrator, consistent with the MOU.  This simply is not a case in which the SPB was "bypassed," at least, not in the sense the *State Personnel Bd. v. Department of Personnel Admin.* court used that word.  Neither is it a case in which an arbitrator "review[ed] and reverse[d] disciplinary action[]" against a state civil service employee, as the *State Personnel Bd. v. Department of Personnel Admin.* court forewarned.  (*State Personnel Bd. v. Department of Personnel Admin., supra*, 37 Cal.4th at p. 527.)  Because the SPB reviewed the disciplinary action for cause under the Civil Service Act, and the arbitrator considered the discipline for violations of the MOU and the Dills Act, it is more accurate to say the award offset the suspension.

The problem, as we understand it, is not that the MOU allows civil service employees to bypass or reverse the SPB.  The problem instead appears to be that the SPB exercised constitutional authority to review the 60-workday suspension under the Civil Service Act, and the arbitrator exercised remedial power under the MOU to enter an award offsetting that same suspension.  These results are not necessarily inconsistent with California law.  After all, there could be just cause for discipline under the Civil Service Act, and retaliatory motive for that same discipline under the Dills Act.  (See, e.g., *Visalia, supra*, 98 Cal.App.5th at p. 863, fn. 24 ["The fact sufficient cause existed for discipline does not mean there was no unlawful retaliation.  Other circumstances may prove a retaliatory motive notwithstanding sufficient cause for discipline"].)  No one denies these things can legally coexist.  Nevertheless, they stand in some tension with one

28

another. That tension specifically arises from the overlapping adjudications of the SPB and the arbitrator. Who should have the last word as to whether Lopez serves the 60-workday suspension? The SPB, by virtue of its constitutional authority? The arbitrator, by virtue of the MOU? PERB, by virtue of its jurisdiction to adjudicate violations of the Dills Act? The parties and amicus propose various answers, but we do not need to resolve these questions, at least not today.

Today's questions, again, are whether the SPB's constitutional duty to "review disciplinary actions" constitutes an "explicit," "clear," or "well defined and dominant" expression of public policy, and whether the award contravenes that policy. (*Richey, supra*, 60 Cal.4th at p. 916; *City of Palo Alto, supra*, 77 Cal.App.4th at p. 338; *Jordan, supra*, 100 Cal.App.4th at p. 452; *City of Richmond, supra*, 189 Cal.App.4th at p. 671; *Hochariw, supra*, 83 Cal.App.5th at p. 899.) Answering these questions is easier said than done, because CDCR is cagey about how, exactly, the award allegedly violated article VII, section 3, subdivision (a). Even allowing for various possibilities, however, we find ourselves unable to say "yes" to both questions, as we next explain.

### e. Whether the Award Contravenes an Expression of Public Policy Embodied in Article IV, Section 3, Subdivision (a)

CDCR primarily argues the award offends article VII, section 3, subdivision (a)'s imperative that the SPB "review disciplinary actions." We have no trouble accepting that the constitutional mandate to "review disciplinary actions" constitutes an "explicit," "clear," or "well defined and dominant" expression of public policy. (*Richey, supra*, 60 Cal.4th at p. 916; *Jordan, supra*, 100 Cal.App.4th at p. 452; *Hochariw, supra*, 83 Cal.App.5th at p. 899.) But CDCR does not argue the award violates that policy as expressed. Nor does CDCR seem able to do so. Again, the SPB reviewed the disciplinary action under the Civil Service Act, consistent with article VII, section 3, subdivision (a). That the arbitrator also reviewed the discipline for violations of the MOU and the Dills Act does not mean the SPB was prevented from reviewing the

29

disciplinary action under the Civil Service Act. The arbitrator's award may have overlapped with the SPB's exercise of authority, but overlapping adjudications are not uncommon in our system of administrative law (see e.g., *Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 937) and we perceive no inherent conflict between the SPB's determination that the 60-workday suspension was "just and proper" under the Civil Service Act, and the arbitrator's determination that CDCR interfered with protected speech and representational activity in violation of the MOU and the Dills Act, such that the suspension should be set aside. These results are not "necessarily incompatible," in the sense that enforcing one would require violating the other. (Cf. *City of Palo Alto, supra*, 77 Cal.App.4th at pp. 338, 339-340.)

CDCR also refers to the merit principle. The merit principle has been described as "inviolate" (*Pacific Legal Foundation, supra*, 29 Cal.3d at p. 194), and could reasonably be characterized as an "explicit," "clear," or "well defined and dominant" expression of public policy. (*Richey, supra*, 60 Cal.4th at p. 916; *Jordan, supra*, 100 Cal.App.4th at p. 452; *Hochariw, supra*, 83 Cal.App.5th at p. 899; see also *International Union of Operating Engineers, supra*, 58 Cal.App.5th at p. 873 [suggesting the merit principle amounts to a well-defined public policy].)[15] But CDCR does not argue the award

---

[15] *International Union of Operating Engineers* though procedurally analogous to the present case, is distinguishable on the facts. There, the subject MOU gave civil service employees the right to request that " 'materials of a negative nature' " be purged from their personnel files after one year. (*International Union of Operating Engineers, supra*, 58 Cal.App.5th at p. 865.) An arbitrator determined the Department of Water Resources violated the MOU by using purged documents to support disciplinary action against an employee and directed the Department of Human Resources to cease and desist from further violations. (*Ibid*.) The Department of Human Resources and the Department of Water Resources filed a petition to vacate or correct the award under Code of Civil Procedure section 1285. (*International Union of Operating Engineers, supra*, at p. 865.) The trial court denied the petition and the Court of Appeal reversed. (*Id.* at p. 866.)

violates the merit principle either, presumably for good reason. (See generally *California Correctional Peace Officers Assn. v. Department of Corrections & Rehabilitation* (2017) 15 Cal.App.5th 97, 106-107 (*California Correctional Peace Officers*) ["Not every grant of certain functions relating to employment of civil service employees to an administrative agency other than the SPB violates the merit principle"]; see also *Fair Housing & Employment Com., supra*, 39 Cal.3d at pp. 438-439 ["Just as the 'merit principle' is not infringed upon by the institution of collective bargaining, so it is unharmed by the watchdog functions of the fair employment agencies"].)

Last but not least, CDCR argues the award violates public policy by failing to "harmonize" or "accommodate" the SPB's findings, as supposedly required by *Pacific Legal Foundation.* As previously discussed, *Pacific Legal Foundation* and *Fair Employment & Housing Com.* each anticipated the problem of conflicting adjudications between agencies, and counseled that they be resolved "either by administrative accommodation between the two agencies themselves or, failing that, by sensitive application of evolving judicial principles." (*Pacific Legal Foundation, supra*, 29 Cal.3d at p. 200, fn. omitted; *Fair Employment & Housing Com., supra*, 39 Cal.3d at p. 442, fn. 20.) But that guidance, though instructive, does not constitute an "explicit," "clear," or "well defined and dominant" expression of public policy. (*Richey, supra*, 60 Cal.4th at p. 916; *Jordan, supra*, 100 Cal.App.4th at p. 452; *Hochariw, supra*, 83 Cal.App.5th at p.

---

On appeal, the Department of Human Resources and the Department of Water Resources argued the award undermined the merit principle by requiring civil service employers to purge negative material from employee's personnel files, interfering with their ability to make "reasonable and sound employment decisions based on merit." (*International Union of Operating Engineers, supra*, 58 Cal.App.5th at p. 877.) The Court of Appeal agreed. (*Id.* at pp. 877-878.)

Here, as we have said, CDCR does not argue the award violates the merit principle. Consequently, we have no need to consider *International Union of Operating Engineers* further.

899.)  Even assuming an arbitrator could achieve an administrative accommodation with an agency, we are not directed to any established standard for resolving their interests, and we are hard-pressed to say that the high court's support for comity constitutes an explicit expression of public policy.  The same can be said for the "sensitive application of evolving judicial principles."  (*Pacific Legal Foundation, supra*, at p. 200; *Fair Employment & Housing Com., supra*, at p. 442.)  Here again, our high court's guidance, though helpful, is hardly an "explicit," "clear," or "well defined and dominant" expression of public policy.  (*Richey, supra*, at p. 916; *Jordan, supra*, at p. 452; *Hochariw, supra*, at p. 899.)

When all is said and done, we conclude article VII, section 3, subdivision (a) constitutes an explicit expression of public policy that the SPB must be allowed to review disciplinary actions for violations of the Civil Service Act, but the award itself does not violate that policy.  We further conclude that, though the award might run counter to the goals of administrative accommodation and sensitive application of evolving judicial principles, neither of these are explicit expressions of public policy.  Accordingly, we conclude the public policy exception is inapplicable, at least so far as article VII, section 3, subdivision (a) is concerned.  That leaves CDCR's arguments concerning the need to combat the code of silence.

 2. *Public Policy Geared Towards Combatting the Code of Silence*

CDCR argues the judgment should be affirmed on the alternative ground that the arbitrator's award violates public policy by undermining efforts to combat the code of silence.[16]  CDCR finds support for the existence of an "explicit, well defined public policy aimed at combatting the [c]ode of [s]ilence" in various legislative history materials

---

[16] CDCR expends considerable energy decrying the code of silence and expounding on the need to eradicate it.  We have no quarrel with any of these arguments, but they are not relevant to whether the public policy exception applies.

32

and CDCR's "Department Operations Manual."  We question whether any of these things constitute "an explicit legislative expression of public policy," as required by the public policy exception.  (*Richey, supra*, 60 Cal.4th at p. 916.)  But even assuming they do, the award itself does not violate any such policy.

As previously discussed, the public policy exception requires that the award itself conflict with an expression of public policy.  (See, e.g., *City of Palo Alto, supra*, 77 Cal.App.4th at pp. 339-340; *City of Richmond, supra*, 189 Cal.App.4th at p. 671; *SingerLewak, supra*, 241 Cal.App.4th at p. 625.)  Thus, the question presented is not whether Lopez violated public policy by fostering the code of silence, but whether public policy requires that correctional officers found to have engaged in such conduct be suspended, such that the award violates that policy.  (*City of Palo Alto, supra*, at p. 337 [rejecting argument that arbitrator's award violated public policy against workplace violence, where there was no indication "the public policy entails the obligation to automatically fire any employee" who engages in such misconduct]; *City of Richmond, supra*, at p. 671 ["The relevant question . . . is not whether there is a public policy against sexual harassment generally but whether according finality to the arbitrator's decision would be incompatible with that public policy"].)

CDCR has not established that the asserted public policy against the code of silence requires any particular term of suspension, such that the arbitrator's offsetting award violated that policy.  Consequently, we conclude the judgment cannot be affirmed on the alternative ground that the arbitrator's award violates an expression of public policy geared towards combatting the code of silence.

### III.  DISPOSITION

The judgment denying the petition to confirm the arbitrator's award and granting the petition to correct the award is reversed, and the matter remanded with instructions to enter a new judgment confirming the award in its entirety, without correction.  Appellant

California Correctional Peace Officers Association shall recover its costs on appeal.

(Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/S/
_____
RENNER, Acting P. J.

We concur:

/S/
_____
KRAUSE, J.


/S/
_____
WISEMAN, J.*

_____

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.